# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHAIM KAPLAN, *et al.*, | |
| *Plaintiffs*, | |
| *v.* | Case No. 1:10-CV-00483 (RWR) |
| CENTRAL BANK OF THE ISLAMIC REPUBLIC OF IRAN, *et al.*, | |
| *Defendants*. | |

**MEMORANDUM OF LAW OF BANK SADERAT IRAN AND BANK SADERAT PLC
IN SUPPORT OF THEIR MOTION TO DISMISS**

Frank C. Razzano
Ivan B. Knauer
Jeremy D. Frey
Matthew D. Foster
John C. Snodgrass

PEPPER HAMILTON LLP
Hamilton Square
600 Fourteenth Street, N.W.
Washington, DC 20005-2004
(202) 220-1200

*Counsel for Defendants
Bank Saderat Iran and
Bank Saderat PLC*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

FACTS ................................................................................................................. 2

PART I: CERTAIN ARGUMENTS COMMON TO BSI AND BSPLC .................................... 3

1. THE COMPLAINT SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION BECAUSE IT PRESENTS A NON-JUSTICIABLE POLITICAL QUESTION ................................................................................ 3

2. THE COMPLAINT SHOULD BE DISMISSED UNDER THE ACT OF STATE DOCTRINE ................................................................................................. 10

3. PLAINTIFFS LACK STANDING TO SUE BECAUSE THEIR INJURIES ARE NOT "FAIRLY TRACEABLE" TO DEFENDANTS' ALLEGED CONDUCT ........... 14

4. THE ALIEN TORT CLAIMS ACT DOES NOT PROVIDE SUBJECT MATTER JURISDICTION BECAUSE PLAINTIFFS ARE NOT ALIENS AND BECAUSE THE ALLEGED KILLINGS DID NOT VIOLATE INTERNATIONAL LAW (FIFTH CLAIM) .................................................. 16

5. PLAINTIFFS FAIL TO STATE A CLAIM AGAINST DEFENDANTS UNDER THE ALIEN TORT CLAIMS ACT (FIFTH CLAIM) .................................... 19

6. PLAINTIFFS FAIL TO STATE A CLAIM AGAINST BSI AND BSPLC FOR "AIDING AND ABETTING" UNDER THE ALIEN TORT CLAIMS ACT (FIFTH CLAIM) ........................................................................... 20

    A. Plaintiffs Fail to Allege Substantial Assistance ............................................ 21

    B. Plaintiffs Fail to Show that BSI and BSPLC Acted with the Required Purpose of Facilitating Violations of International Law ........................................... 22

    C. Plaintiffs Fail to Plead Causation .................................................................. 23

7. ABSENT FEDERAL QUESTION JURISDICTION, THIS COURT SHOULD DECLINE SUPPLEMENTAL JURISDICTION OVER THE ISRAELI CLAIMS (SIXTH AND SEVENTH CLAIMS) ................................................... 23

8. CERTAIN OF THE SUPPLEMENTAL PLAINTIFFS' INJURIES DO NOT ARISE FROM THE SAME CASE OR CONTROVERSY (SIXTH AND SEVENTH CLAIMS) .................................................................. 24

#12966430 v16

9.    THE ISRAELI LAW CAUSES OF ACTION ALLEGED IN THE COMPLAINT FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED (SIXTH AND SEVENTH CLAIMS) .................................................................. 25

10.   PLAINTIFFS WHO BRING THIS ACTION AS PERSONAL REPRESENTATIVES OF DECEDENTS HAVE FAILED TO COMPLY WITH FED. R. CIV. P. 17 ................................................................................ 27

11.   THE CLAIMS OF PLAINTIFFS SUING OTHER THAN AS PERSONAL REPRESENTATIVES OF DECEDENTS MUST BE DISMISSED (FIFTH CLAIM) ...................................................................................................... 28

12.   UNDER FED. R. CIV. P. 12(B)(7) AND 19(B), ALL CLAIMS SHOULD BE DISMISSED FOR FAILURE TO JOIN INDISPENSABLE PARTIES ........................ 29

PART II: ARGUMENTS UNIQUE TO BSI .................................................................. 30

13.   PLAINTIFFS' FSIA CLAIMS SHOULD BE DISMISSED BECAUSE BSI IS NOT AN INSTRUMENTALITY OF IRAN (FIRST AND SECOND CLAIMS) .......... 30

14.   PLAINTIFFS' FSIA CLAIMS ARE BARRED BY THE ACT OF WAR EXCLUSION (FIRST AND SECOND CLAIMS) ........................................................ 31

15.   THE AMERICAN PLAINTIFFS ARE NOT PROPER PLAINTIFFS FOR A FSIA CLAIM (FIRST AND SECOND CLAIMS) ........................................................ 32

16.   THE COMPLAINT SHOULD BE DISMISSED UNDER RULE 12(B)(6) FOR FAILURE TO STATE A CLAIM AGAINST BSI UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT (28 U.S.C. § 1605A) (FIRST AND SECOND CLAIMS) ..................................................................................................... 34

PART III: ARGUMENTS UNIQUE TO BSPLC .......................................................... 35

17.   PLAINTIFFS' ATA CLAIMS ARE BARRED BY THE ACT OF WAR EXCLUSION (THIRD AND FOURTH CLAIMS) ........................................................ 35

18.   THE COMPLAINT SHOULD BE DISMISSED UNDER RULE 12(B)(6) FOR FAILURE TO STATE A CLAIM AGAINST BSPLC UNDER THE ATA (18 U.S.C. § 2333) (THIRD AND FOURTH CLAIMS) ........................................................ 36

    A.   Plaintiffs Fail to State an ATA Claim Based on a Primary Liability Theory (Third Claim) ............................................................................................ 36

    B.   Plaintiffs Fail to State an ATA Claim Based on an Aiding-and-Abetting Theory (Fourth Claim) .................................................................................. 39

PART IV: THE ALLEGATIONS OF THE COMPLAINT CONCLUSIVELY
    ESTABLISH A LACK OF PERSONAL JURISDICTION OVER EITHER BSI OR
    BSPLC ............................................................................................................................ 39

CONCLUSION ...................................................................................................................... 45

#12966430 v16

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abdullahi v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009), *cert. denied*, 130 S. Ct. 3541 (2010) ..........................................................................................................................19, 28

*Aktepe v. United States*, 105 F.3d 1400 (11th Cir. 1997) ...........................................6

*Allen v. Wright*, 468 U.S. 737 (1984) .........................................................................15

*Asahi Metal Indus. Co. v. Sup. Ct.*, 480 U.S. 102 (1987) ...............................40, 42, 43

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ..................................................................19

*Baker v. Carr*, 369 U.S. 186 (1962)...................................................................3, 4, 5, 8

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964) .............................10

*Bauman v. DaimlerChrysler Corp.*, 579 F.3d 1088 (9th Cir. 2009)............................40

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)..............19, 20, 22, 32, 35, 36, 38

*Ben-Rafael v. Islamic Rep. of Iran*, 540 F. Supp. 2d 39 (D.D.C. 2008) ..................34, 35

*Bigio v. Coca-Cola Co.*, 239 F.3d 440, 452 (2d Cir. 2000).........................................13

*Blue Tree Hotel Inv. (Can.) Ltd. v. Starwood Hotel & Resorts Worldwide, Inc.*, 369 F.3d 212 (2d Cir. 2004)........................................................................................................1

*Boim v. Holy Land Found. for Relief and Dev.,* 291 F.3d 1000 (7th Cir. 2002) (*"Boim I"*) ........38

*Boim v. Holy Land Found. for Relief and Dev.,* 511 F.3d 707 (7th Cir. 2007) (*"Boim II"*) ........38

*Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685 (7th Cir. 2008) ("*Boim III*")....38, 39

*Brady Campaign to Prevent Gun Violence v. Ashcroft*, 339 F. Supp. 2d 68 (D.D.C. 2004).........15

*Brisbin v. Wash. Sports & Ent'mt, Ltd.*, 442 F. Supp. 2d 9 (D.D.C. 2006) ...................26

*Brooks v. Ross*, 578 F.3d 574 (7th Cir. 2009).......................................................19, 20

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)...............................................39

*Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86 (D.D.C. 2003) ...............25

*Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343 (1988)...............................................24

*Chicago & S. Airlines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103 (1948)......................................6

*Clark v. Matsushita Elec. Indus. Corp.*, 811 F. Supp. 1061 (M.D. Pa. 1993) ...............................41

*Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496 (5th Cir. 2000)...........................................1

*Condit v. Dunne*, 317 F. Supp. 2d 344 (S.D.N.Y. 2004) ................................................................1

*Doe v. Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005) ..................................................................7, 8, 9

*Doe v. Liu Qi*, No. C-02-0672-CW (N.D. Cal. Sept. 27, 2002)....................................................10

*Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003)................................................................30, 31

*EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621 (D.C. Cir. 1992).................................1

*Empagran, S.A. v. F. Hoffman-La Roche Ltd.*, 453 F. Supp. 2d 1 (D.D.C. 2006)........................24

*Erickson v. Pardus*, 551 U.S. 89 (2007) .....................................................................................19

*Estate of Manook v. Research Triangle Inst., Int'l*, 693 F. Supp. 2d 4 (D.D.C. 2010) ................27

*Estate of Michael Heiser*, 659 F. Supp. 2d 20 (D.D.C. 2009) ......................................................34

*Filártega v. Peña-Irala*, 630 F.2d 876 (2d Cir. 1980) ................................................................40

*Fisher v. Great Socialist People's Libyan Arab Jamahiriya*, 541 F. Supp. 2d 46 (D.D.C. 2008) ............................................................................................................................................29

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000).................15

*Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506 (D.C. Cir. 2002) ........................................41

*Grand Lodge of Fraternal Order of Police v. Aschcroft*, 185 F. Supp. 2d 9 (D.D.C. 2001)...........1

*Greenberg v. Bush*, 150 F. Supp. 2d 447 (E.D.N.Y. 2001) ..........................................................16

*Greenham Women Against Cruise Missiles v. Reagan*, 755 F.2d 34 (2d Cir. 1985).................9, 10

*Haase v. Sessions*, 835 F.2d 902 (D.C. Cir. 1987) ........................................................................1

*Helicopteros Nacionales de Colombia, S. A. v. Hall*, 466 U.S. 408 (1984) ...............39, 40, 41, 43

*Herero People's Reparations Corp. v. Deutsche Bank AG*, 2003 U.S. Dist. LEXIS 27086 (D.D.C. June 30, 2003) ...........................................................................................................40, 45

*Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992)...........................................................23

*Hurst v. Socialist People's Libyan Arab Jamahirya*, 474 F. Supp. 2d 19 (D.D.C. 2007) ............29

*In re Baan Co. Sec. Litig.*, 81 F. Supp. 2d 75 (D.D.C. 2000) ...........................................40, 41, 42

*In re Grand Jury Subpoena dated August 9, 2000*, 218 F. Supp. 2d 544
    (S.D.N.Y. 2002) .........................................................................................................12, 13

*In re South African Apartheid Litig.*, Civ. No. 4712, 2009 WL 960078 (S.D.N.Y. Apr. 8,
    2009) ..........................................................................................................................22

*In re Terrorist Attacks on Sept. 11, 2001*, Mem. Decision and Order at 16 (S.D.N.Y.
    June 17, 2010)............................................................................................................42

*In re Terrorist Attacks on Sept. 11, 2001*, 2007 U.S. Dist LEXIS 74356 (S.D.N.Y. Oct. 5,
    2007) .............................................................................................19, 25, 42, 43

*In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 830 (S.D.N.Y. 2005)................23

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) ..................................................39, 41

*Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27 (D.D.C. 2001).........................................34

*Johnson v. Eisentrager*, 339 U.S. 763 (1950)..............................................................................17

*Keeton v. Hustler Mag.*, 465 U.S. 770 (1984) .............................................................................41

*Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254 (2d Cir. 2007)....................................21, 22

*Kiobel v. Royal Dutch Petroleum Dev. Corp.*, 2008 U.S. Dist LEXIS 16592 (S.D.N.Y.
    2008) .....................................................................................................................40, 45

*Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44 (2d Cir. 1991) ................................................42

*Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118 (2d Cir. 2006) ........................................24

*Kowal v. MCI Comm'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).........................................20

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006) .......................................................23, 37

*Licci v. Am. Express Bank Ltd.*, 2010 U.S. Dist. LEXIS 32873 (S.D.N.Y. Mar. 10, 2010)..........26

*Lizarbe v. Rondon*, 642 F. Supp. 2d 473 (D. Md. 2009)..............................................................17

*Military and Paramilitary Activities* (Nicar. v. U.S.), 1986 I.C.J. 14, 1986 ICJ LEXIS 4,
    at ¶ 115 (June 27).........................................................................................................7

*Met. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560 (2d Cir. 1996)...............................41, 43

*Mountain States Legal Found. v. Bush*, 306 F.3d 1132 (D.C. Cir. 2002).....................................20

*Mwani v. Bin Laden*, 417 F.3d 1 (D.C. Cir. 2005)...............................................................40, 41

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2008) ..............21

*Prosecutor v. Tadić*, Case No. IT-94-1-A (ICTY July 15, 1999) ....................................................7

*Rasul v. Bush*, 542 U.S. 466 (2004) ....................................................................................17, 18

*Roe v. Unocal Corp.*, 70 F. Supp. 2d 1073 (C.D. Cal. 1999) ......................................................13

*Saltany v. Reagan*, 702 F. Supp. 319 (D.D.C. 1988) ...........................................................12, 13

*Schaaf v. Resid. Funding Corp.*, 517 F.3d 544 (8th Cir. 2008) ....................................................36

*Schneider v. Kissinger*, 310 F. Supp. 2d 251, 260 (D.D.C. 2004) ................................................9

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976) ............................................................15

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ..........................................................................14

*Strauss v. Credit Lyonnais*, 2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006) ..............................22, 36

*Stutts v. The De Dietrich Group*, 2006 WL 1867060 (E.D.N.Y. June 20, 2006) ........22, 26, 35, 38

*United Mine Workers v. Gibbs*, 383 U.S. 715 (1966) ..................................................................23

*Univ. of Montreal Pension Plan v. Bank of America Sec., LLC*, 2007 WL 528703
    (S.D.N.Y. Feb. 20, 2007) ........................................................................................................36

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454
    U.S. 464 (1982) ...............................................................................................................14, 15

*W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400 (1990) ...............10, 11

*Weiss v. Nat'l Westminster Bank*, 453 F. Supp. 2d 609 (E.D.N.Y. 2006) ........................21, 36, 37

*Wultz v. Islamic Rep. of Iran*, Case No. 1:08-CV-1460 (RCL) (D.D.C. Aug. 22, 2008) ..............27

**STATUTES**

18 U.S.C. § 2331(4) ....................................................................................................................35

18 U.S.C. § 2333 .............................................................................................................35, 36, 38

18 U.S.C. § 2336(a) ....................................................................................................................35

28 U.S.C. §1350 ...............................................................................................................16, 20, 28

28 U.S.C. § 1367 .............................................................................................................23, 24, 25

28 U.S.C. §1603 ...........................................................................................................................30

28 U.S.C. § 1605A .................................................................................30, 31, 32, 33, 34

28 U.S.C. §1608(b) ..............................................................................................................32

**FEDERAL RULES**

Fed. R. Civ. P. 4(f)(2) .........................................................................................................32

Fed. R. Civ. P. 4(k)(2) .........................................................................................................40

Fed. R. Civ. P. 12(b) .............................................................................1, 20, 23, 29, 35, 39

Fed. R. Civ. P. 17 .................................................................................................................27

Fed. R. Civ. P. 44.1 .............................................................................................................27

Fed. R. Evid. 201 ...........................................................................................................1, 27

**OTHER AUTHORITIES**

BLACK'S LAW DICTIONARY (7th ed. 1999) ......................................................................16

DAILY TELEGRAPH (Aug. 22, 2006), *available at*
http://www.telegraph.co.uk/news/1526970/Peacekeeping-force-wont-disarm-
Hizbollah.html. ...............................................................................................................5

BBC NEWS, Mar. 8, 2007, *PM "Says Israel pre-planned war,"*
http://news.bbc.co.uk/2/hi/6431637.stm ......................................................................5

BSI Annual Report 2008-2009, at 23, *available at*
http://in.bsi.ir/PortalData/Subsystems/StaticContent/uploads/Image/Final%201-
%2046%20Non%20Back.pdf. ......................................................................................31

CBI web site, *Non-Government-Owned Banks: Bank Saderat Iran*,
http://www.cbi.ir/page/7315.aspx .......................................................................... 30-31

Ellen S. Podgor & Roger S. Clark, INT'L CRIM. L. §§ 2.04, 14.02 (2d ed. 2008)..........................17

Eric Langland, *Decade of Descent: The Ever-Shrinking Scope and Application of
Universal Jurisdiction*..........................................................................................17

Henry A. Kissinger, *The Pitfalls of Universal Jurisdiction*..........................................17

Israel Ministry of Foreign Affairs, *PM Olmert: Lebanon is responsible and will bear the
consequences*, July 12, 2006,
http://www.mfa.gov.il/MFA/Government/Communiques/2006/PM+Olmert+-
+Lebanon+is+responsible+and+will+bear+the+consequences+12-Jul-2006.htm ....................1

#12966430 v16

Lara Deeb, *Hizballah: A Primer*, MID. E. REP. ONLINE, July 31, 2006,
    http://www.merip.org/mero/mero073106.html ...........................................................................1

Mark Tran, *The second Lebanon war*, GUARDIAN, Jan. 30, 2008
    http://www.guardian.co.uk/world/2008/jan/30/israelandthepalestinians.marktran ..................5

MERRIAM-WEBSTER'S Collegiate Dictionary 10th ed. ..........................................................31

Patrick Bishop, *Peacekeeping force won't disarm Hizbollah*, DAILY TELEGRAPH (Aug.
    22, 2006), *available at* http://www.telegraph.co.uk/news/1526970/Peacekeeping-
    force-wont-disarm-Hizbollah.html ...............................................................................5

Press Release, Security Council, Security Council Calls for End to Hostilities Between
    Hizbollah, Israel, Unanimously Adopting Resolution 1701 (2006) – Permanent
    Ceasefire to Be Based on Creation of Buffer Zone Free of Armed Personnel Other
    than UN, Lebanese Forces, U.N. Doc. SC/8808 (Aug. 11, 2006), *available at*
    http://www.un.org/News/Press/docs/2006/sc8808.doc.htm .........................................5

*Statement by FM Livni on Hizbullah attack from Lebanon,* July 12, 2006,
    http://www.mfa.gov.il/MFA/About+the+Ministry/MFA+Spokesman/2006/Statement
    +by+FM+Livni+on+Hizbullah+attack+from+Lebanon+12-Jul-2006.htm ..............................1

U.N. Human Rights Council [HRC], Report of the Comm'n of Inquiry of Lebanon
    Pursuant to Human Rights Council Res. S-2/1*, at 26, U.N. Doc. A/HRC/3/2
    (Nov. 23, 2006), *available at*
    http://www2.ohchr.org/english/bodies/hrcouncil/docs/specialsession/A.HRC.3.2.pdf............5

U.S. CONST. art. III ..................................................................................................2, 7, 14, 23, 25

U.S. CONST. amend. V ..............................................................................................................40, 43

Winograd Commission Final Report ¶ 11, Jan. 30, 2008, available at
    http://www.cfr.org/publication/15385/winograd_commission_final_report.html....................5

# PRELIMINARY STATEMENT

In the Summer of 2006, Israel and Lebanon were at war. During the course of that war, as was widely reported in the press and as plaintiffs allege here, rockets were fired that killed and injured people on both sides of the border separating Israel and Lebanon. Plaintiffs in this action are Israeli, Canadian, and United States citizens who claim that they or their relatives were harmed by these acts of war.

To prevail in this case, plaintiffs must convince this Court, and this Court must find, among other matters, that the armed conflict widely known as the Second Lebanon War, and officially declared a war by Israel,[1] was instead a series of terrorist attacks. To reach that

---

[1]     As the Israeli Prime Minister stated on July 12, 2006, the events of that day were not a terrorist attack, but an act of war against Israel by a sovereign state, Lebanon, of whose government Hezbollah is a member. Israel Ministry of Foreign Affairs, *PM Olmert: Lebanon is responsible and will bear the consequences*, July 12, 2006, http://www.mfa.gov.il/MFA/Government/Communiques/2006/PM+Olmert+-+Lebanon+is+responsible+and+will+bear+the+consequences+12-Jul-2006.htm; Israel Ministry of Foreign Affairs, *Statement by FM Livni on Hizbullah attack from Lebanon,* July 12, 2006, http://www.mfa.gov.il/MFA/About+the+Ministry/MFA+Spokesman/2006/Statement+by+FM+Livni+on+Hizbullah +attack+from+Lebanon+12-Jul-2006.htm (stating that Hezbollah is part of the Lebanese government) (attached as Exhibits A and B to this memorandum). Hezbollah has been an active participant in Lebanese politics since 1992, when it won eight seats in Lebanon's first post-war elections, making it the largest single bloc in the country's 128-member parliament. Lara Deeb, *Hizballah: A Primer*, MID. E. REP. ONLINE, July 31, 2006, http://www.merip.org/mero/mero073106.html. In the 2005 elections, Hezbollah increased the number of seats it held in the Lebanese parliament to 14, participating in a 35 seat voting bloc with other parties. *Id.* That same year, Hezbollah also chose to participate in the Lebanese cabinet. *Id.*

Defendants ask the Court to take judicial notice of Prime Minister Olmert's and Foreign Minister Livni's statements under Fed. R. Evid. 201. While this Court is required to accept as true all the factual allegations of the complaint when reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), the plaintiffs have the burden of establishing the Court's jurisdiction. Therefore, the plaintiffs' factual allegations bear close scrutiny, which permits this Court to consider material outside of the pleadings in an effort to determine whether it has jurisdiction. *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624-25 n. 3 (D.C. Cir. 1992); *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987); *Grand Lodge of Fraternal Order of Police v. Aschcroft*, 185 F. Supp. 2d 9, 14 (D.D.C. 2001). This Court may also consider the pronouncements of the State of Israel on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) without converting the motion into a motion for summary judgment. While a court must normally accept plaintiff's factual allegations as true, it can consider documents attached as exhibits or incorporated by reference as part of the pleading. *Blue Tree Hotel Inv. (Can.), Ltd. v. Starwood Hotel & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004). Documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claims. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)). For example, in *Condit v. Dunne*, 317 F. Supp. 2d 344, 357 (S.D.N.Y. 2004), the court considered transcripts of audio recordings submitted with defendant's motion to dismiss without converting it to a motion for summary judgment because the recordings were referenced in the complaint. Here, the armed struggle is referred to

(continued...)

conclusion, this Court would have to rule on political questions and acts of foreign states: matters far beyond the power of an Article III court.  Simply raising these issues decides this motion: under the political question and act of state doctrines, the Court cannot and should not rule on such questions.  Even if this Court should deny defendants' motion to dismiss on these grounds, there are numerous other grounds for dismissing this case, including the lack of personal jurisdiction.

This memorandum is divided into four parts: (I) arguments for dismissal common to both defendants; (II) arguments unique to Bank Saderat Iran ("BSI"); (III) arguments unique to Bank Saderat PLC ("BSPLC"); and (IV) arguments related to personal jurisdiction.  If the Court resolves the common issues in defendants' favor, there will be no reason to reach the arguments unique to BSI or BSPLC or the arguments that the Court lacks personal jurisdiction over BSI and BSPLC.

## FACTS

Plaintiffs are Israeli, Canadian, and United States citizens who claim that they or their relatives were killed or injured in Israel by missiles fired from Lebanon into Israel between about July 12 and August 14, 2006, during the Second Lebanon War.

BSI is an international financial institution headquartered in Iran.  Its name means "the Export Bank of Iran."  It commenced operation in 1952 and today has more than 3,000 branches and over 30,000 employees.  It is not alleged to have any operations or employees in the United States and, notwithstanding the conclusory allegations of the complaint, does no

_____

(continued...)

in the complaint.  Thus, the nature of the struggle as described by the Israeli government in public statements is incorporated by reference.

business in the United States. BSPLC is a bank incorporated in England and Wales and is a wholly owned subsidiary of BSI. Like BSI it has no operations or employees in the United States and does no business in the United States. Plaintiffs do not allege that BSPLC has any connection to the United States.

The complaint alleges that BSI and BSPLC participated in a transfer of funds that ultimately benefited Hezbollah. Absent from the complaint, however, is any specificity regarding defendants' alleged roles in the funds transfer. Neither the specifics of the transfer nor the actual recipient of the transfer are ever identified in the complaint. In fact, the press release attached to the complaint states that the payments were not made to Hezbollah, but were made to other entities that forwarded the funds to Hezbollah.

While one feels deep sympathy for plaintiffs and all the other civilians in Israel and Lebanon injured during the Second Lebanon War, these feelings cannot alter the fact that plaintiffs' counsel has attempted to stretch the law beyond all recognizable limits. As described below, the complaint substitutes conjecture and conclusory statements for factual allegations in an attempt to establish BSI and BSPLC's liability for acts of which they have no knowledge and for which they have no legal responsibility.

## PART I
## CERTAIN ARGUMENTS COMMON TO BSI AND BSPLC

**1. THE COMPLAINT SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION BECAUSE IT PRESENTS A NON-JUSTICIABLE POLITICAL QUESTION**

Plaintiffs' claims are non-justiciable under the political question doctrine, and the Court should therefore dismiss the complaint under Rule 12(b)(1) for lack of subject matter jurisdiction. Courts have long held that the judicial branch must take special care not to become entangled in political questions best left to other branches of government. In *Baker v. Carr*, 369

U.S. 186 (1962), the Supreme Court identified six factors a court should consider to determine

whether a case presents a non-justiciable political question. If any one of these factors is present,

a court should dismiss the claim:

> [1] a textually demonstrable constitutional commitment of the
> issue to a coordinate political department; or [2] a lack of judicially
> discoverable and managerial standard for resolving it; or [3] the
> impossibility of deciding without an initial policy determination of
> a kind clearly for nonjudicial discretion; or [4] the impossibility of
> a court's undertaking independent resolution without expressing
> lack of the respect due coordinate branches of government; or [5]
> an unusual need for unquestioning adherence to a political decision
> already made; or [6] the potentiality of embarrassment from
> multifarious pronouncements by various departments on one
> question.

*Id.* at 217.

In this case, all of these factors weigh heavily in favor of dismissal. The facts

alleged in the instant case arose out of the Second Lebanon War between Israel and Lebanon, of

whose government Hezbollah is a member. On July 12, 2006, describing actions carried out

against Israeli Defense Forces on the Lebanese border, Prime Minister Olmert of Israel stated:

> This morning's events were not a terrorist attack, but the action of
> a sovereign state that attacked Israel for no reason and without
> provocation. The Lebanese government, of which Hizbullah is a
> member, is trying to undermine regional stability. Lebanon is
> responsible and Lebanon will bear the consequences of its actions.[2]

In response to a question that asked "is there cause to prepare the nation for war and will you call

for an emergency government?" Prime Minister Olmert responded:

> One thing must be understood: This was an act of war without any
> provocation on the sovereign territory—about which there is no
> dispute—of the State of Israel. It is absolutely clear to the
> international community that Israel will respond and that it will
> respond in an unequivocal fashion that will cause those who started

---

[2]     See *supra* note 1.

this act of war to bear a very painful and far-reaching
responsibility for those actions.[3]

The Final Report of the Winograd Commission, published on June 30, 2008,

regarding an investigation by the government of Israel into the Second Lebanon War of 2006,

concludes that "Israel initiated a long war, which ended without clear military victory."[4]  In fact,

the war was concluded as a result of a United Nations-brokered cease fire.[5]  During the Second

Lebanon War, which included the incursion by Israeli troops into Lebanon, Israel lost 119

soldiers and 43 civilians, while between 250 and 500 Hezbollah members died, and more than

1,000 Lebanese civilians were killed.[6]

If this action proceeds, the Court will have to decide whether the attacks

complained of by plaintiffs were acts of war, as the Israeli government described them, or were

instead acts of terrorism, as the complaint seeks to characterize them.  Such a political

determination is left to the executive and legislative branches, not the courts, because of the risk

that it would interfere with the conduct of foreign policy.  The Supreme Court long ago

---

[3]      *Id.*

[4]      Winograd Commission Final Report ¶ 11, Jan. 30, 2008, *available at*
http://www.cfr.org/publication/15385/winograd_commission_final_report.html (attached as Exhibit C).

[5]      See Press Release, Security Council, Security Council Calls for End to Hostilities Between
Hizbollah, Israel, Unanimously Adopting Resolution 1701 (2006) – Permanent Ceasefire to Be Based on Creation of
Buffer Zone Free of Armed Personnel Other than UN, Lebanese Forces, U.N. Doc. SC/8808 (Aug. 11, 2006),
*available at* http://www.un.org/News/Press/docs/2006/sc8808.doc.htm.

[6]      Mark Tran, *The second Lebanon war*, Guardian, Jan. 30, 2008
http://www.guardian.co.uk/world/2008/jan/30/israelandthepalestinians.marktran; *PM "Says Israel pre-planned
war,"* BBC News, Mar. 8, 2007, http://news.bbc.co.uk/2/hi/6431637.stm; U.N. Human Rights Council [HRC],
Report of the Comm'n of Inquiry of Lebanon Pursuant to Human Rights Council Res. S-2/1*, at 26, U.N. Doc.
A/HRC/3/2 (Nov. 23, 2006), *available at*
http://www2.ohchr.org/english/bodies/hrcouncil/docs/specialsession/A.HRC.3.2.pdf; Patrick Bishop, *Peacekeeping
force won't disarm Hizbollah*, Daily Telegraph (Aug. 22, 2006), *available at*
http://www.telegraph.co.uk/news/1526970/Peacekeeping-force-wont-disarm-Hizbollah.html.

explained why judges should tread cautiously in a pending lawsuit with regard to political questions related to foreign policy issues such as those implicated here:

> [T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the dominion of political power not subject to judicial intrusion or inquiry.

*Chicago & S. Airlines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948).

As the Supreme Court observed, political questions are to be left to elected representatives of the people in both the executive and legislative branches of government. *Id.* For example, in *Aktepe v. United States*, 105 F.3d 1400 (11th Cir. 1997), Turkish sailors sued for injuries after an aircraft carrier mistakenly attacked their ship during a training exercise. The court held that the case had been properly dismissed on political question grounds. The court found that, because the claim arose from a Navy exercise, it necessarily implicated the relationship between the United States and its allies. Moreover, the court held that assessing whether the Navy properly fired the missiles required a determination of how a "reasonable military force" should have acted. *Id.* at 1404. In the court's view, it was difficult to conceive of an area of governmental activity in which the courts have less competency, because "courts lack standards with which to assess whether reasonable care was taken to achieve military objectives while minimizing injury and loss of life." *Id.* As the court noted, a judgment would inevitably require "initial policy decisions of a kind appropriately reserved for military discretion," and would "express a lack of respect for the political branches of government." *Id.*

These considerations of judicial discretion are particularly relevant here, as this case implicates the relationship between the United States, Israel, and Lebanon at a particularly delicate point in history. Whether there was a war between Israel and Lebanon is a matter that is not committed to the judicial, but to the legislative and executive, branches. Here, the Israeli government has already determined that a state of war existed with Lebanon.

Any argument that Hezbollah is not a nation state, and that it, not Lebanon, was at war with Israel is spurious. Not only is that contrary to the statements of Israeli Prime Minister Olmert (who equated Lebanon with Hezbollah, described Hezbollah as a member of the Lebanese government, and concluded that an attack by Hezbollah was an attack by Lebanon), but also, under international law, whether a military or paramilitary group's actions can be attributed to a sovereign state, in order to render a conflict an international armed conflict, depends on the state's degree of authority or control over that group. See, e.g., *Military and Paramilitary Activities* (Nicar. v. U.S.), 1986 I.C.J. 14, 1986 ICJ LEXIS 4, at ¶ 115 (June 27); *Prosecutor v. Tadić*, Case No. IT-94-1-A, Judgment, ¶¶ 88-137 (ICTY July 15, 1999).[7] Prime Minister Olmert's government made the determination under international law that Hezbollah's acts were those of Lebanon, such that a state of war existed between Israel and Lebanon. Any re-examination of that decision would interfere with the foreign policy determination made by an ally of the United States. Thus, the problem is that to resolve such issues in Article III courts would require litigating and potentially reversing military and political judgments that have been committed to non-judicial branches of government.

Indeed, in *Doe v. Israel*, 400 F. Supp. 2d 86, 111-12 (D.D.C. 2005), this Court stated that it is "hard to conceive of an issue more quintessentially political in nature than the

---

[7] Available at http://www.icty.org/x/cases/tadic/acjug/en/tad-aj990715e.pdf.

#12966430 v16

ongoing Israeli-Palestinian conflict, which has raged on the world stage with devastation on both sides for decades." The Court went on to say:

> The region of the Middle East specifically, and the entire global community generally, is sharply divided concerning these tensions; American foreign policy has come under attack as a result. This Court has previously observed that "foreign policy is constitutionally committed to the political branches, and disputes of a foreign policy are non-justiciable political questions."

*Id.* at 112 (citing cases). The plaintiffs in *Doe v. Israel* based their claim on the premise that Israel had committed *jus cogens* violations in carrying out its settlement policy in the West Bank. *Id.* at 105. The plaintiffs brought the suit under the Alien Tort Claims Act ("ATCA"), the Torture Victim Protection Act ("TVPA"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), customary international law, assorted international conventions and agreements, and tort law of various American states. *Id.* at 97. Among other things, plaintiffs asserted that Israel committed genocide, crimes against humanity, and war crimes, including intentional killings, torture, and inhumane treatment, in the course of its confrontation with Palestinians in the West Bank. *Id.* This Court characterized the plaintiffs' complaint as "replete with nonjusticiable political questions" and held that the plaintiffs' particular allegations implicated all but the fifth of the sixth political question categories[8] enumerated in the Supreme Court's *Baker v. Carr* decision. *Id.* at 111-13.

With respect to the first *Baker* category mentioned above, the Court in *Doe* stated that the plaintiffs, as they do in this case, asked the Court to declare that the conduct of parties to a conflict were tantamount to terrorism. *Id.* at 112. The Court stated unequivocally that it could not do this:

---

[8] *See* discussion *supra* at 4.

> Whether plaintiffs address their claims in the garb of RICO or other federal statutes, or the tort laws of various states, the character of those claims is, at its core, the same: peculiarly volatile, undeniably political, and ultimately nonjusticiable. A ruling on any of these issues would draw the Court into the foreign affairs of the United States, thereby interfering with the sole province of the executive branch….Our government's foreign relations are "committed by the Constitution to the Executive and Legislative—'the political'—Departments of the Government, and the propriety of what may be done in the exercise of political power is not subject to judicial inquiry or decision."

*Id.* (quoting *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918)).

The Court recognized that, at first blush, it might appear that the plaintiffs were only seeking redress for suffering or other vindication of rights, as the plaintiffs claim in this case. *Id.* However, the Court noted that the legality or propriety of Israel's actions in the West Bank directly weighed on whether the plaintiffs' injuries were redressable. *Id.* This, the Court stated, would require it to characterize the armed conflict in the West Bank as either genocide or self-defense. *Id.* The Court concluded that "[s]uch a predicate policy determination is plainly reserved to the political branches of government, and the Court is simply not equipped with 'judicially discoverable or manageable standards' for resolving a question of this nature." *Id.* at 112-113 (citing *Schneider v. Kissinger*, 310 F. Supp. 2d 251, 260 (D.D.C. 2004)).

In the present case, plaintiffs raise political questions regarding the conduct of Israel and Lebanon (and its surrogate Hezbollah, a member of the Lebanese government) during the Second Lebanon War. This Court should decline the plaintiffs' invitation to wade into such politically and diplomatically fraught questions just as it should if similar claims were brought by Lebanese victims of the hostilities. Instead, the Court should dismiss the plaintiffs' claims as non-justiciable under the political question doctrine. This was the direction the court took in *Greenham Women Against Cruise Missiles v. Reagan*, 755 F.2d 34 (2d Cir. 1985), where a British group challenged the deployment of U.S. missiles in the United Kingdom. The court

found that the complaint raised "issues which have been committed by the Constitution to coordinate political departments…and request[ed] relief which cannot be granted absent an initial policy determination of a kind clearly for nonjudicial discretion." *Id.* at 37 (internal citations omitted).[9]

## 2.    THE COMPLAINT SHOULD BE DISMISSED UNDER THE ACT OF STATE DOCTRINE

The Court should dismiss the complaint under the act of state doctrine because plaintiffs' ability to recover turns on the extent to which their injuries resulted from state action. The act of state doctrine applies where "the outcome of the case turns upon…the effect of official action by a foreign sovereign." *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 406 (1990). The Supreme Court has described the doctrine as "a consequence of domestic separation of powers, reflecting 'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs." *Id.* at 404 (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964)). The policies underlying the doctrine include "international comity, respect for the sovereignty of foreign nations on their own territory, and the avoidance of embarrassment to the Executive Branch in the conduct of foreign relations." *Kirkpatrick*, 493 U.S. at 408. Justice Scalia described the application of the act of state doctrine as follows:

---

[9]    There is one additional aspect that this court should consider in arriving at its decision. In an Alien Tort Claims Act case against certain Chinese officials for prosecuting the Falun Gong, a religious group, the U.S. Department of State asked the court "to take into account the potential for reciprocal treatment of United States officials by foreign courts in efforts to challenge U.S. government policy" including suits "by individuals (including foreign nationals) in a foreign court against U.S. officials for alleged violations of customary international law in carrying out their official functions under the Constitution, laws and programs of the United States…." *See* Statement of Interest of the United States at 8, *Doe v. Liu Qi*, No. C-02-0672-CW (N.D. Cal. Sept. 27, 2002) (attached as Exhibit D). This case implicates the same issues. If the Court were to allow plaintiffs to maintain this action, it could encourage foreign courts to allow similar cases to be brought against U.S. government officials, including members of the United States military deployed throughout the world in defense of our country. Moreover, it could encourage other Israeli and Lebanese victims of the Second Lebanon War to bring their cases before this Court for resolution.

> In every case in which we have held the act of state doctrine applicable, the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory.
>
> …
>
> Act of state issues only arise when a court *must decide*—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign.  When that question is not in the case, neither is the act of state doctrine.

*Id.* at 405-06.

The elements of the act of state doctrine require that the act be "official" and "performed within the territory" of the foreign sovereign, and that a U.S. court be required to decide on the validity of that official act performed within the territory of the foreign sovereign. *Id.* at 406.  Here, the validity of Israel's official act, performed within its territory (its declaration of war against Lebanon) is at the center of this litigation.  For plaintiffs' claims to succeed, the Court will be required to determine the validity of Israel's contention that a state of war (namely, the Second Lebanon War) existed at the time of the attacks described in the complaint. The injuries described in the complaint occurred during a war in which civilians on both sides died—a war that was brought to an end as a result of negotiations by the United Nations.  This war touches upon sensitive issues of American foreign relations, not only with respect to one of the U.S.'s closet allies in the Middle East, Israel, but also with Lebanon, where the United States government has spent years trying to foster a democratic government.  It is fundamental to our system of separation of powers that courts should not interfere with or undermine the U.S. executive branch's ability to conduct foreign affairs.

In the present case, the plaintiffs will likely attempt to argue that the act of state doctrine does not apply because plaintiffs' deaths were extrajudicial killings of civilians.  But this begs the issue because the plaintiffs are asking the Court to determine whether these killings

resulted from terrorism or war.  As the court stated in *In re Grand Jury Subpoena 1*, 218 F. Supp.

2d 544 (S.D.N.Y. 2002):

> The act of state doctrine counsels a court to avoid examining the validity of an official act of a sovereign state taken on its own soil….[W]here the relief sought or the defense interposed would require a federal court to declare invalid the foreign government's official act,….[t]he foreign government need not be party to the action; the doctrine may apply if the validity of the acts of a foreign sovereign will be passed on by the court.

*Id.* at 551-52 (internal citations omitted).

In this case, the plaintiffs ask the Court to overrule Prime Minister Olmert's

statement that Lebanon and Israel were at war and to find instead that the armed conflict that

occurred in July and August of 2006 was solely an act of terrorism by Hezbollah.  The plaintiffs,

who are alleged to be Israeli citizens and residents (although some may have dual American

citizenship), have no right to request that this Court overrule the political determination by the

government of the country in which they are living as to the nature of the armed conflict in

which Israel was engaged.  For the Court to entertain such a determination would offend notions

of international comity and sovereignty.  This matter must accordingly be dismissed under the

act of state doctrine.

In *Saltany v. Reagan*, 702 F. Supp. 319, 320-321 (D.D.C. 1988), plaintiffs sought

to recover damages for death, personal injury, and property loss that occurred during air strikes

by U.S. military forces on targets in Libya.  Defendants, including the President of the United

States, various civilian and military officials of the U.S. government, the Prime Minister of the

United Kingdom, and the United Kingdom, moved to dismiss the case.  The Court held, with

respect to the claims made against the United Kingdom, that the act of state doctrine compelled

dismissal.

> What is charged is, quite simply, Britain's complicity in an illicit act of war committed by the United States. By any definition that description of the United Kingdom's alleged wrongful conduct constitutes an archetypal act of state. Permission given by the head of government of one sovereign nation, speaking from its seat of government, to allow its territory to be utilized by an ally, at the ally's expressed request, to mount a military operation against a third power could not possibly be otherwise characterized. The Court concludes that the doctrine stands as an absolute bar to action against the United Kingdom, and it therefore becomes unnecessary to consider the several other jurisdictional objections it has advanced in support of its motion to dismiss.

*Id.* at 320-21.

Here, according to the Prime Minister of Israel, Hezbollah, acting as an agent of the Lebanese government, not only attacked Israel's military, but also kidnapped two of its soldiers. In response, Israel took military action against Lebanon, crossing Lebanon's border and engaging in a conflict that resulted in the death of military personnel and civilians on both sides. This war was brought to a conclusion as a direct result of intervention by the United Nations. Conduct in the course of a war constitutes, as Judge Jackson of this Court said in *Saltany*, "archetypal acts of state." In such circumstances, a court should defer to the executive branch, especially when its decision could "embarrass or hinder the executive in the realm of foreign relations." *In re Grand Jury Subpoena 1*, 218 F. Supp. 2d at 557 (quoting *Bigio v. Coca-Cola Co.*, 239 F.3d 440, 452 (2d Cir. 2000)).

In *Roe v. Unocal Corp.*, 70 F. Supp. 2d 1073 (C.D. Cal. 1999), the court dismissed an ATCA claim after determining that it would place the court in the position of evaluating the legitimacy of orders directed to subordinate officers of a foreign military. The court stated that continuing the litigation, necessitating discovery into, among other things, "details of their command structure and the authority of commanding officers," would place the court "in an unseemly, if not impossible, position." *Id.* at 1079. Because U.S. courts "rarely if

ever, entertain suits challenging the propriety of orders from the United States Armed Forces," the court was not persuaded that it should undertake such an inquiry with respect to a foreign military. *Id.* at 1080.

To entertain this suit would require this Court to delve into the relationship in 2006 between Hezbollah—then and now a member of the Lebanese parliament—and the Lebanese government itself. Discovery would have to be taken into the command structure and authority of Hezbollah and its relationship to the elected government in Beirut. Rather than attempt these politically sensitive tasks, this Court should simply refuse to disturb the conclusion reached by Prime Minister Olmert of Israel at the time, that Israel was at war with Lebanon.

Finally, as the Supreme Court noted in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), "the possible collateral consequences of making international rules privately actionable argue for judicial caution." *Id.* at 727. This Court simply cannot turn a blind eye to the foreign policy implications of questioning the determination by the State of Israel that this conflict was a war. The implications for Israel and the United States are ominous. Nations may take actions during the course of a state of war that they would not ordinarily be permitted to take otherwise. For this Court to overrule the political determination by the elected leaders of the State of Israel would constitute an exercise of power not vested in Article III judges.

## 3. PLAINTIFFS LACK STANDING TO SUE BECAUSE THEIR INJURIES ARE NOT "FAIRLY TRACEABLE" TO DEFENDANTS' ALLEGED CONDUCT

Plaintiffs lack standing to sue BSI and BSPLC because plaintiffs' injuries are too attenuated from any alleged act or omission of BSI and BSPLC. The Constitution limits a federal court's power to resolving "cases and controversies." U.S. CONST. art. III, § 2; *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471

(1982). The doctrine of standing is one of the most important components of the case or controversy requirement. *Allen v. Wright,* 468 U.S. 737, 750 (1984).

To establish standing, plaintiffs must allege that (1) they suffered an injury in fact that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc.* v. *Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180-81 (2000). The "fairly traceable" requirement tests whether "the line of causation" between defendants' conduct and plaintiffs' injury is "too attenuated." *Allen,* 468 U.S. at 752. Plaintiffs lack standing where it is "purely speculative" that the injury can be fairly traced to "the challenged action of the defendant," as opposed to "the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 41-42 (1976); *Brady Campaign to Prevent Gun Violence* v. *Ashcroft,* 339 F. Supp. 2d 68, 77 (D.D.C. 2004).

Plaintiffs allege only that BSI and BSPLC participated in a funds transfer that, plaintiffs allege, eventually benefitted Hezbollah. The complaint states that:

> Defendant CBI transferred funds belonging to Iran to Defendant BSI; Defendant BSI then transferred these funds to Defendant BSPLC in London; Defendant BSPLC then transferred these funds to accounts controlled by Hezbollah in branches of Defendant BSI in Beirut, from which Hezbollah then withdrew these funds.

Compl. ¶ 36. Additionally, plaintiffs rely on a release from the United States government that states "from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah *fronts* in Lebanon that support acts of violence." *Id*. ¶ 37 (emphasis added).

Plaintiffs lack standing because their alleged injuries are too attenuated from the transfers allegedly executed by the Central Bank of Iran ("CBI") to BSI and from BSI to BSPLC.

-15-

Plaintiffs' injuries are far more closely tied to acts of unidentified third parties—without whose "independent action" plaintiffs would not have been injured, namely, those who allegedly planned and carried out the attacks. *See Greenberg* v. *Bush,* 150 F. Supp. 2d 447, 455 (E.D.N.Y. 2001) (dismissing for lack of standing a claim that American foreign policy resulted in terrorist attacks in Israel because "[i]t would be difficult to imagine a clearer example of a third party's actions breaking the causal chain").

Plaintiffs' conclusory assertion that the monetary transfers "substantially increased Hezbollah's ability to plan and carry out terrorists acts" is wholly insufficient and implausible. Compl. ¶ 39. Rather, plaintiffs must meet their burden by alleging facts from which it could be reasonably inferred that, absent defendants' actions, there is a substantial probability that plaintiffs would not have been attacked by a third party. *See Greenberg,* 150 F. Supp. 2d at 455 (finding that plaintiffs failed to satisfy their burden to prove that "absent Defendants' unlawful acts, there is a substantial probability that Plaintiffs would not have been" injured by a third party). Because the complaint fails to satisfy this burden, this Court must conclude that plaintiffs' injuries cannot be "fairly traced" to defendants and, accordingly, dismiss plaintiffs' claims against defendants for lack of standing.

4. **THE ALIEN TORT CLAIMS ACT DOES NOT PROVIDE SUBJECT MATTER JURISDICTION BECAUSE PLAINTIFFS ARE NOT ALIENS AND BECAUSE THE ALLEGED KILLINGS DID NOT VIOLATE INTERNATIONAL LAW (FIFTH CLAIM)**

The ATCA grants this Court "original jurisdiction of any civil action by an *alien* for tort alone, committed in violation of the law nations or a treaty of the United States." 28 U.S.C. §1350 (emphasis supplied). While the statute does not define "alien," the term is defined elsewhere as a "person who resides within the borders of a country but is not a citizen or subject of that country." BLACK'S LAW DICTIONARY 72 (7th ed. 1999). Under this definition, only those

-16-

who are citizens of other countries but who reside in the United States may bring claims under the ATCA.

The complaint does not allege that the plaintiffs were resident or even present in the United States in 2006. In fact, the complaint alleges that the plaintiffs resided in Israel. For this reason, the plaintiffs may not maintain a cause of action under the ATCA because the statute covers only claims made by aliens. This interpretation makes perfect sense: absent a requirement that the plaintiff reside in the United States, the federal courts of this country would in effect become international courts for the whole world.[10] As the Supreme Court noted in *Johnson v. Eisentrager*, 330 U.S. 763 (1950), "the privilege of litigation has been extended to aliens, whether friendly or enemy, only because permitting their presence in the country implied protection." *Id.* at 777-78.

Defendants are aware of only one case which has dealt with the issue, *Lizarbe v. Rondon*, 642 F. Supp. 2d 473 (D. Md. 2009). In this case, Judge Masetti held that the Supreme Court had disposed of this argument in *Rasul v. Bush*, 542 U.S. 466 (2004), where Justice Stevens' majority opinion allowed non-resident aliens to proceed with habeas corpus petitions. With all due respect to Judge Masetti, his reliance on *Rasul* is misplaced. In *Rasul*, the Court

---

[10] While a criminal court may assert universal jurisdiction over a limited number of international crimes like piracy, slavery, hostage taking, genocide, war crimes and torture, we have found no case that allows the assertion of universal jurisdiction over civil torts. Even in the criminal arena, it has been recognized that universal jurisdiction is essentially a matter of foreign relations committed to the political branches of government. As a result of efforts to arrest and prosecute Israeli officials, such as Foreign Minister Tozipi Livni, Defense Minister Ehud Barak, and General Doron Almog, in London, as well as efforts to prosecute American officials in Belgium and Spain, there has been a backlash against universal jurisdiction. Indeed, the United States threatened to move NATO headquarters from Brussels if officials of member countries continued to be targeted. Eric Langland, *Decade of Descent: The Ever-Shrinking Scope and Application of Universal Jurisdiction*, 39 ABA INT'L L. NEWS 4 (Summer 2010). This has resulted in legislation and proposed legislation opposing universal jurisdiction on sovereignty grounds. *Id.*; Ellen S. Podgor & Roger S. Clark, INT'L CRIM. L. §§ 2.04, 14.02 (2d ed. 2008). Indeed, courts are now requiring that there be some special circumstance, such as a relationship to the victim, that requires the exercise of international criminal jurisdiction by a court before it proceeds. *Id.* Otherwise, as Henry Kissinger noted, universal jurisdiction could substitute the tyranny of judges for that of governments. Henry A. Kissinger, *The Pitfalls of Universal Jurisdiction*, FOREIGN AFF., July/August 2001.

began its analysis by noting that "for more than two years [the plaintiffs] have been imprisoned in a territory over which the United States exercises exclusive jurisdiction and control." *Rasul v. Bush*, 542 U.S. at 469. The Court then went on to say:

> Rather, because "the writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody," a district court acts "within [its] respective jurisdiction" within the meaning of § 2241 as long as "the custodian can be reached by service of process."
>
> ***
>
> In the end, the answer to the question presented is clear. Petitioners contend that they are being held in federal custody in violation of the laws of the United States. No party questions the district court's jurisdiction over petitioners' custodians….Section 2241, by its terms, requires nothing more. We therefore hold that § 2241 confers on the district court jurisdiction to hear petitioners' habeas corpus challenges to the legality of their detention at the Guantanamo Bay Naval Base.

*Id.* at 478-79, 483-84 (internal citations omitted).

In other words, in *Rasul*, the Court based jurisdiction on the fact that the aggrieved individuals were in United States custody at Guantanamo Bay, over which the United States had sole and exclusive jurisdiction. *Rasul* is simply not authority for the issue reached by Judge Masetti. Here, plaintiffs are not alleged to be residents of (nor even present in) the United States and therefore are not aliens for ATCA purposes. Nor are they alleged to be in custody in the United States. As a consequence, the reasoning of *Rasul* does not apply here. The Supreme Court in *Rasul* did not decide the issue presented here: whether the term "alien" in the ATCA includes all foreigners, including those who reside outside the United States, as opposed to persons who reside in this country, but are not United States citizens.

Finally, plaintiffs lack subject matter jurisdiction to bring a claim under the ATCA because killings and related injuries that occur during a war do not result from torts in

violation of the law of nations.  Since plaintiffs' injuries alleged here occurred during the Second

Lebanon War, no cause of action lies.  As the Second Circuit recently noted in *Abdullahi v.*

*Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009), *cert. denied*, 130 S. Ct. 3541 (2010), the term

"violation of the law of nations" applies only to norms of international law to which states

unequivocally subscribe, must be no less definite in content than the historical paradigms

familiar when the ATCA was enacted, and must "by means of express international accords" be

"of mutual concern to the nations of the world."  *Id.* at 184-85.

**5.     PLAINTIFFS FAIL TO STATE A CLAIM AGAINST DEFENDANTS UNDER THE ALIEN TORT CLAIMS ACT (FIFTH CLAIM)**

The Court should dismiss plaintiffs' ATCA claims for failure to state a claim

upon which relief can be granted.  Plaintiffs fail to meet the pleading standard set by the

Supreme Court's recent rulings in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), *Erickson*

*v. Pardus*, 551 U.S. 89 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).  In these decisions,

the Supreme Court significantly tightened the criteria for properly asserting claims in federal

court.  *See Brooks v. Ross*, 578 F.3d 574, 581-82 (7th Cir. 2009) (discussing *Twombly*, *Erickson*,

and *Iqbal* and affirming dismissal where plaintiff "failed to ground his legal conclusions in a

sufficiently plausible factual basis").

Under the new pleading standard, a complaint's "[f]actual allegations must be

enough to raise a right to relief above the speculative level…."  *Twombly*, 550 U.S. at 555.  The

complaint must contain something "more than labels and conclusions."  *Id.*  "[A] formulaic

recitation of the elements of a cause of action will not do."  *Id.*  Instead, plaintiffs must plead

sufficient *facts* to "nudge[] their claims across the line from conceivable to plausible."  *Id.* at 570

(emphasis added).  *See, e.g., In re Terrorist Attacks on Sept. 11, 2001*, 2007 U.S. Dist LEXIS

74356, at *8 (S.D.N.Y. Oct. 5, 2007) (dismissing Antiterrorism Act ("ATA") claim against

defendant bank where plaintiff had "not cited any facts which would make that claim plausible"). In other words,

> the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations.

*Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1134 (D.C. Cir. 2002) (quoting *Kowal v. MCI Comm'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)); *accord Brooks v. Ross*, 578 F.3d at 581 ("[C]ourts should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements.").

Plaintiffs' ATCA claims should be dismissed under Fed. R. Civ. P. 12(b)(6) because plaintiffs fail to allege facts sufficient to allow the Court to conclude that plaintiffs were injured as a result of BSI and BSPLC's intentional acts. Plaintiffs' entire case against BSI and BSPLC is premised on the conclusory allegations set forth in paragraph 36 of the complaint: namely, that CBI transferred funds to BSI, which then transferred funds to its subsidiary BSPLC, which then transferred funds to Hezbollah "front" organizations, and that Hezbollah used the funds to engage in extrajudicial killings. But plaintiffs allege no facts to support these conclusions. The complaint's allegations against BSI and BSPLC never move beyond the sort of "formulaic recitation of the elements of a cause of action" rejected by the Supreme Court in *Twombly*. *See, e.g.,* Compl. ¶¶ 35, 40-41, 147-53.

6. **PLAINTIFFS FAIL TO STATE A CLAIM AGAINST BSI AND BSPLC FOR "AIDING AND ABETTING" UNDER THE ALIEN TORT CLAIMS ACT (FIFTH CLAIM)**

The Court should dismiss plaintiffs' claim for relief under the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, because plaintiffs have failed to allege facts sufficient to support the essential elements of their "aiding and abetting claim" claim: substantial assistance

and intent.  In *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254 (2d Cir. 2007), the court

identified two key elements of an ATCA claim of aiding and abetting violations of international

law:

> [A] defendant may be held liable under international law for aiding
> and abetting the violation of that law by another when the
> defendant (1) provides practical assistance to the principal which
> has a substantial effect on the perpetration of the crime, and (2)
> does so with the purpose of facilitating the commission of that
> crime.

*Id.* at 277 (Katzmann, J., concurring); *see also Presbyterian Church of Sudan v. Talisman*

*Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2008) (quoting the *Khulumani* test above).

Because plaintiffs have failed to allege facts that could support findings that: (1)

BSI and BSPLC substantially assisted the violations of international law alleged in the

complaint; and (2) BSI and BSPLC did so with the purpose of facilitating those alleged

violations, the Court should dismiss plaintiffs' ATCA claim.  Moreover, plaintiffs have failed to

allege facts sufficient to demonstrate causation under the ATCA.

### A.     Plaintiffs Fail to Allege Substantial Assistance

Provision of routine banking services, such as those performed by BSI and

BSPLC here, does not constitute substantial assistance sufficient to state an aiding and abetting

claim under the ATCA.  Even assuming that BSI and BSPLC maintained the accounts and

executed the transfers alleged in the complaint, courts that have examined the issue have

consistently held that "the mere maintenance of a bank account and the receipt or transfer of

funds do not…constitute *substantial assistance*" for purposes of establishing a claim for aiding

and abetting liability under the ATCA.  *See, e.g., Weiss v. Nat'l Westminster Bank*, 453 F. Supp.

2d 609, 621-22 (E.D.N.Y. 2006) (emphasis added) (finding plaintiffs' allegations that the bank

knowingly maintained accounts through which it transferred millions of dollars to Hamas

insufficient to hold the bank liable for Hamas's use of the funds); *In re South African Apartheid Litig.*, Civ. No. 4712, 2009 WL 960078, at *12 (S.D.N.Y. Apr. 8, 2009) ("It is (or should be) undisputed that simply doing business with a state or individual who violates the law of nations is insufficient to create liability under customary international law…Aiding a criminal 'is not the same thing as aiding and abetting [his or her] alleged human rights abuses.'"); *Strauss v. Credit Lyonnais*, 2006 WL 2862704, at *9 (E.D.N.Y. Oct. 5, 2006) (finding that mere allegations that a bank knowingly maintained accounts for a Hamas front group and knowingly transferred money to Hamas-controlled entities were insufficient to render the bank liable); *see also Stutts v. The De Dietrich Group*, 2006 WL 1867060, *12 (E.D.N.Y. June 20, 2006) ("Moreover, courts have declined to impose liability on defendants for participation in a commercial enterprise that allegedly assists in another's violations of international law.").

### B.    Plaintiffs Fail to Show that BSI and BSPLC Acted with the Required Purpose of Facilitating Violations of International Law

Plaintiffs also fail to allege sufficient facts to support the stringent intent element of their aiding and abetting claim under the ATCA. *See Khulumani*, 504 F.3d at 289 (describing intent requirement for ATCA claim). As with all of plaintiffs' other claims, their ATCA aiding and abetting claim is bereft of factual allegations. Instead, it is based solely on conclusory assertions that the elements of the claim are met. This is insufficient under modern pleading standards. *See Twombly*, 127 S. Ct. at 1965. Plaintiffs have failed to allege any facts from which the Court could conclude that BSI or BSPLC knew of the nature of the recipient of the alleged funds transfer, or of its purpose, or that BSI or BSPLC acted purposely to facilitate the alleged rocket attacks by Hezbollah—all elements essential to liability under plaintiffs' ATCA claims. Because plaintiffs' claims are conclusory and entirely unsupported by any factual

allegations, they do not rise "above the speculative level" rejected by the Supreme Court in *Twombly.*

### C. Plaintiffs Fail to Plead Causation

Finally, the complaint lacks factual allegations sufficient to support a conclusion that plaintiffs' injuries were caused by any act of BSI or BSPLC. As the Second Circuit held in *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006), "[b]anks do not owe non-customers a duty to protect them from the intentional torts of their customers." *Id.* at 286 (quoting *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 830 (S.D.N.Y. 2005)). Moreover, even if banks did owe non-customers a duty of care, a finding of proximate cause in this context would, in effect, require a bank to be an insurer for any damages caused by its customers. Citing Justice Scalia's concurrence in *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 287 (1992), the court wrote, "[l]ife is too short to pursue every known act to its most remote consequences: 'for want of a nail, a kingdom was lost' is a commentary on fate, not the statement of a major cause of action against a blacksmith." *Lerner*, 459 F.3d at 287. Plaintiffs have failed to allege any facts from which the Court could conclude that plaintiffs' injuries were proximately caused by any act of BSI or BSPLC. The Court should accordingly dismiss plaintiffs' claims under Fed. R. Civ. P. 12(b)(6).

### 7. ABSENT FEDERAL QUESTION JURISDICTION, THIS COURT SHOULD DECLINE SUPPLEMENTAL JURISDICTION OVER THE ISRAELI CLAIMS (SIXTH AND SEVENTH CLAIMS)

Federal district courts have supplemental jurisdiction over non-federal claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). This, however, is "a doctrine of discretion, not of plaintiff's right." *United Mine Workers* v. *Gibbs,* 383 U.S. 715, 726 (1966). A district court "may decline to exercise

supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). The Supreme Court has stated that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining [non-federal] claims." *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n.7 (1988); *accord Kolari* v. *New York-Presbyterian Hosp.,* 455 F.3d 118, 122 (2d Cir. 2006). The Court should accordingly decline to exercise supplemental jurisdiction over the Israeli law claims if it agrees with Defendants that the federal claims should be dismissed. If the Court dismisses the underlying claims on jurisdictional grounds, then it could not properly exercise supplemental jurisdiction over the foreign law claims. *Empagran, S.A. v. F. Hoffman-La Roche Ltd.*, 453 F. Supp. 2d 1, 12 (D.D.C. 2006) (declining to exercise supplemental jurisdiction over foreign law claims where all federal claims over which the Court had original jurisdiction had been dismissed before trial).

8.    **CERTAIN OF THE SUPPLEMENTAL PLAINTIFFS' INJURIES DO NOT ARISE FROM THE SAME CASE OR CONTROVERSY (SIXTH AND SEVENTH CLAIMS)**

In the sixth and seventh claims, certain Israeli citizen plaintiffs (the "Supplemental Plaintiffs") complain of injuries that have no connection to any "extrajudicial killing" under the Foreign Sovereign Immunities Act ("FSIA") or to any claim brought by American citizen plaintiffs (the "American Plaintiffs") under the ATA (Third and Fourth Claims). For this reason, these Supplemental Plaintiffs' claims do not arise out of the same case or controversy as the events on which the other plaintiffs' federal claims are based. Accordingly, this Court should decline to exercise supplemental jurisdiction. The Supplemental Plaintiffs are

identified in Exhibit E, and constitute all those plaintiffs bringing claims only under plaintiffs' sixth and seventh claims, with the exception of plaintiff Orna Mor.[11]

District courts with original jurisdiction over one claim have "supplemental jurisdiction" over other related claims. Related claims are those that are so related that they form part of the same case or controversy within the meaning of Article III. 28 U.S.C. § 1367(a). The Supplemental Plaintiffs fail to allege that their supplemental claims arise out of the same case or controversy as plaintiffs' federal question claims under the ATA and FSIA. Because the Supplemental Plaintiffs' claims have no connection to any alleged extrajudicial killing under the FSIA or to any injury claimed under the ATA, this Court should decline to exercise supplemental jurisdiction over the Supplemental Plaintiffs' claims.

9.      **THE ISRAELI LAW CAUSES OF ACTION ALLEGED IN THE COMPLAINT FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED (SIXTH AND SEVENTH CLAIMS)**

The complaint alleges two Israeli law claims: negligence and vicarious liability. A common thread of U.S. law is that a bank cannot be "liable for injuries done with money that passes through its hands in the form of deposits, withdrawals, check clearing services, or any other routine banking service." *Burnett* v. *Al Baraka Inv. & Dev. Corp.,* 274 F. Supp. 2d 86, 109 (D.D.C. 2003) ("The act of providing material support to terrorists, or 'funneling' money through banks for terrorists is unlawful and actionable, but…[the bank] is alleged only to be the funnel."). This rule is widely accepted. *See, e.g., In re Terrorist Attacks on Sept. 11, 2001*, 2007 U.S. Dist. LEXIS 74356, at *7-8 (dismissing negligence claim on this basis, stating that "the prospect that monies paid to third parties for a legitimate purpose might *eventually* find their way

---

[11] Plaintiff Orna Mor is not included as a Supplemental Plaintiff because her claim for supplemental jurisdiction relates to an alleged injury that occurred at the same time and place as plaintiff Yair Mor, who has asserted claims under plaintiffs' first through fourth claims, resulting from the alleged destruction of their art gallery in Safed, Israel on July 19, 2006.

to terrorists through a series of unrelated transfers was, as a matter of law, not reasonably foreseeable"); *Stutts v. The De Dietrich Group*, 2006 WL 1867060, \*4 (E.D.N.Y. June 30, 2006) (finding no causal link between banks' issuing letters of credit and manufacture of chemical weapons in Iraq).

Israeli law follows U.S. law closely on this point. For example, in a case arising out of the same events as the instant case, counsel for plaintiffs here raised similar claims under Israeli law against American Express relating to transfers that allegedly found their way to Hezbollah. *Licci v. Am. Express Bank Ltd.*, 2010 U.S. Dist. LEXIS 32873 (S.D.N.Y. Mar. 10, 2010). Judge Daniels in the Southern District of New York found that Israeli law and New York law had the same elements: duty of care, breach of duty, and causation. *Id.* at \*19. Those are the same elements under D.C. law. *Brisbin v. Wash. Sports & Ent'mt, Ltd.*, 442 F. Supp. 2d 9, 14 (D.D.C. 2006). Judge Daniels ultimately held that American Express owed no duty to protect non-customers from intentional torts committed by their customers. He went on to say:

> Even if such a duty did exist, the factual allegations in the amended complaint do not support a conclusion that the breach of such a duty was the proximate cause of plaintiffs' injuries. A showing of proximate cause requires plaintiffs to demonstrate that defendant's alleged negligent acts were a substantial cause of the events which produced plaintiffs' injuries….Even if it were alleged that Hizbollah used some funds it received to carry out the 2006 missile attacks, that factual assertion alone would not make every financial transaction traceable to a Hizbollah-controlled entity, no matter how remote, the proximate cause of those attacks. Under the circumstances alleged, it is not reasonably foreseeable that the routine banking services performed by Amex Bank would result in the death and bodily injuries suffered by plaintiffs in relation to attacks launched at Israel.

*Id.* at 23-24 (internal citations omitted). This Court should adopt Judge Daniels' ruling and dismiss the plaintiffs' supplemental Israeli law claims. While Judge Daniels' opinion only deals with the negligence claim, if there is no negligence, there is of course no vicarious liability.

-26-

Counsel for the plaintiffs in this case have also raised the same Israeli law claims in *Wultz v. Islamic Rep. of Iran*, Case No. 1:08-CV-1460 (RCL) (D.D.C. Aug. 22, 2008). In that case, plaintiffs allege that Bank of China provided wire transfers of funds that the plaintiffs contend were used ultimately in a suicide bombing in Israel. Bank of China has submitted a detailed affidavit of an Israeli law expert, attached hereto as Exhibit F, which concludes that no cause of action is stated under Israeli law for negligence, breach of duty, or vicarious liability.[12]

If this Court were inclined to disregard Judge Daniels' well-reasoned opinion or the affidavit submitted in *Wultz* and entertain plaintiffs' Israeli law claims after dismissing the federal claims, we ask that this Court allow further briefing on these issues and permit the parties to submit affidavits or testimony of their own experts, as was done in *Wultz*.

## 10. PLAINTIFFS WHO BRING THIS ACTION AS PERSONAL REPRESENTATIVES OF DECEDENTS HAVE FAILED TO COMPLY WITH FED. R. CIV. P. 17

Under Fed. R. Civ. P. 17, capacity to represent the estate of a foreign decedent is governed by the law of the state in which the district court sits. In the District of Columbia, a foreign personal representative, "upon the filing of a copy of the appointment as personal representative in another jurisdiction may exercise all the powers of such office and may sue and be sued in the District of Columbia." *Estate of Manook v. Research Triangle Inst., Int'l*, 693 F. Supp. 2d 4, 16 (D.D.C. 2010). "Personal representative" is strictly construed under D.C. law to mean only the decedent's officially appointed executor or administrator. Further, the proper legal documents evidencing the appointment of such plaintiffs as a decedent's executor or administrator must be properly filed. *Id.* at 16.

---

[12] This Court can take judicial notice of affidavits filed in other courts under Fed. R. Evid. 201. And under Fed. R. Civ. P. 44.1 it "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence" to determine foreign law.

#12966430 v16

In the present case, there is nothing in the docket to show that the proper legal documents evidencing appointment have been filed. In the absence of a timely filing, the claims of plaintiffs who purport to act as decedents' executor or administrator must be dismissed by the Court.[13]

## 11. THE CLAIMS OF PLAINTIFFS SUING OTHER THAN AS PERSONAL REPRESENTATIVES OF DECEDENTS MUST BE DISMISSED (FIFTH CLAIM)

The complaint asserts claims for the extrajudicial killings of Manal Azzam, Fadya Jum'a, Samira Jum'a and Sultana Jum'a. Compl. ¶¶ 147-53. The respective plaintiffs claim to be personal representatives of the decedents, but also seek damages in their own right as relatives of the decedents. The chart attached as Exhibit G identifies plaintiffs bringing ATCA claims in individual and purported representative capacities.

The ATCA provides that the "district courts shall have original jurisdiction of any civil action by an alien for a tort only committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Therefore, a plaintiff may assert a claim only for a violation of international law. In *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 177 (2d Cir. 2009), the ATCA's violations of international law requirement was limited to norms to which states unequivocally subscribe, that are definite in content, and are of mutual concern to the nations of the world. There is no indication in international law that relatives of decedents who were killed extrajudicially may sue for their own injuries.

Thus, the cause of action in plaintiffs' fifth claim permits only the decedent, through his or her personal representative, to sue in connection with an extrajudicial killing. It

---

[13]     Our review of the complaint indicates that such plaintiffs include Miriam Juma'a, Salah Juma'a, Said Juma'a, Abdel El-Rahman Juma'a, Rahma Abu-Shahin, Abdel Gahni Abdel Gahni, and Shadi Salman Azzam.

does not allow relatives to sue for damages they sustained as a result of the extrajudicial killing of their relatives. *Cf. Fisher v. Great Socialist People's Libyan Arab Jamahiriya*, 541 F. Supp. 2d 46, 54 (D.D.C. 2008) ("The plain language and the legislative history of the TVPA make clear that standing is limited to the victim himself or one bringing a claim on behalf of the victim….Therefore, [plaintiffs] cannot seek damages for any injuries they sustained as a result of their brother's death."); *Hurst v. Socialist People's Libyan Arab Jamahirya*, 474 F. Supp. 2d 19, 30 (D.D.C. 2007) (holding that recovery was limited to the actual victim, legal representative or claimant in action for wrongful death). Accordingly, claims brought by plaintiffs for personal injuries, other than as personal representatives of the decedents, must be dismissed.

## 12. UNDER FED. R. CIV. P. 12(B)(7) AND 19(B), ALL CLAIMS SHOULD BE DISMISSED FOR FAILURE TO JOIN INDISPENSABLE PARTIES

The rocket and missile attacks that caused the alleged harm in this case occurred during the course of what the Israeli government and the United Nations termed a war between Lebanon and Israel, namely the Second Lebanon War.[14] In order to adjudicate these claims, this Court would have to find as a matter of fact that plaintiffs were injured by acts of terrorism, which is directly contrary to Israeli PM Olmert's statement. Both Israel and Lebanon consequently have an interest in the subject matter of this litigation, i.e., whether a state of war existed or not. Any decision by this Court contrary to the assertions of the Israeli government would impair or impede the national interest of Israel and Lebanon. As a result, Israel and Lebanon are indispensable parties.

---

[14] See footnote 1 *supra*.

#12966430 v16

# PART II
## ARGUMENTS UNIQUE TO BSI

**13.     PLAINTIFFS' FSIA CLAIMS SHOULD BE DISMISSED BECAUSE BSI IS NOT AN INSTRUMENTALITY OF IRAN (FIRST AND SECOND CLAIMS)**

The first and second claims of the complaint seek to hold BSI liable for injuries to the American Plaintiffs based on the alleged provision of material support to Hezbollah. Although Section 1605A of the FSIA was enacted in 2008, plaintiffs seek to apply Section 1605A retroactively to the events of the Second Lebanon War described in the complaint. Section 1605A provides that a foreign state shall not be immune from jurisdiction in any action in which money damages are sought against a foreign state for personal injury or death caused by the provision of material support or resources for an act of extrajudicial killing, if the provision of such material support is engaged in by an official, employee or agent of the foreign state acting within the scope of his office, employment, or agency.  28 U.S.C. § 1605A(a)(1).  The complaint asserts claims against BSI under the private right of action provision in 1605A(c), based on the proposition that BSI is an agency and instrumentality of defendant Iran.  Compl. ¶ 15.

Whether BSI is a foreign state is determined by reference to 28 U.S.C. §1603. Under Section 1603(a), a foreign state includes "an agency or instrumentality of a foreign state." "Agency or instrumentality" is defined in Section 1603(b).  A corporate entity such as BSI qualifies as an "agency or instrumentality" if a majority of its shares or other ownership interest is directly owned by a foreign state.  *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003).

BSI is not an agency or instrumentality of Iran.  Although the complaint alleges that BSI is an agency and instrumentality of Iran and that Iran owns over 90% of the shares of BSI (Compl. ¶ 15), these claims are insupportable.  BSI is a non-government-owned bank, as is

#12966430 v16

evident from the web site of the Central Bank of Iran.[15]  On June 9, 2009, BSI was privatized:

only 49% of its shares stayed with the Iranian government.[16]

That BSI had not been privatized prior to the Second Lebanon War is of no

moment.  The Supreme Court has held that whether an entity is an "agency or instrumentality" of

a foreign government is to be determined at the time of the filing of the complaint.  *Dole Food*,

538 U.S. at 480.  Accordingly, because BSI was privatized on June 9, 2009, it was not an agency

or instrumentality of Iran on March 23, 2010, when plaintiffs filed the complaint, and is therefore

not a proper defendant under Section 1605A.

## 14.     PLAINTIFFS' FSIA CLAIMS ARE BARRED BY THE ACT OF WAR EXCLUSION (FIRST AND SECOND CLAIMS)

Section §1605A(a)(1), in pertinent part, provides that a foreign state shall have no

sovereign immunity for the provision of "material support or resources" for an extrajudicial

killing by an employee or official of such foreign state.  Thus, by its terms, Section 1605A

provides a cause of action for an extrajudicial killing.  28 U.S.C. §1605A(h)(7) incorporates the

following definition of extrajudicial killing:

> a deliberated killing not authorized by a previous judgment
> pronounced by a regularly constituted court affording all the
> judicial guarantees which are recognized as indispensable by
> civilized peoples. Such term, however, does not include any such
> killing that, under international law, is lawfully carried out under
> the authority of a foreign nation.

---

[15]     *See Non-Government-Owned Banks: Bank Saderat Iran*, http://www.cbi.ir/page/7315.aspx.

[16]     BSI Annual Report 2008-2009, at 23, *available at*
http://in.bsi.ir/PortalData/Subsystems/StaticContent/uploads/Image/Final%201-%2046%20Non%20Back.pdf.

#12966430 v16

Plaintiffs' allegations in paragraphs 56-57 of the complaint do not support a finding that there was an extrajudicial killing because the killings occurred during the Second Lebanon War. Killings during a war are generally not violations of international law. Despite Israel's pronouncement that these killings on both sides occurred during a war, plaintiffs insist without support that they were acts of terrorism committed pursuant to a so-called Hezbollah Agreement with Iran. Because plaintiffs' injuries occurred in the course of armed conflict between two or more nations, plaintiffs cannot recover under FSIA.[17]

## 15. THE AMERICAN PLAINTIFFS ARE NOT PROPER PLAINTIFFS FOR A FSIA CLAIM (FIRST AND SECOND CLAIMS)

Section 1605A(c) provides a private right of action to U.S. nationals, their legal representatives and certain others for "personal injury or death caused by acts described in subsection (a)(1)" of Section 1605A. Section 1605A(a)(1), in pertinent part, provides that a foreign state shall have no sovereign immunity for the provision of "material support or resources" for an extrajudicial killing by an employee or official or agent of such foreign state. Thus, by its terms, Section 1605A provides a cause of action for an extrajudicial killing, and for the provision of material support resulting in an extrajudicial killing.

---

[17] Plaintiffs' claims against BSI should also be dismissed for insufficiency of service of process. If BSI were an instrumentality of Iran, which it is not, then the sole method by which it could be served with process is under 28 U.S.C. §1608(b). According to Docket Entry No. 10 in this case, plaintiffs purported to serve the summons and complaint in this matter pursuant to 28 U.S.C. §1608(b)(3)(B). However, as the docket sheet itself discloses, service was not effected by mail under that section, but by DHL. The word "mail" is defined as "something sent or carried in the postal system." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 10th ed. p. 701. Because the summons and complaint was not sent through the postal system, but by a private carrier, the exclusive method of service was not utilized in this case.

If this Court finds that BSI is not an instrumentality of Iran, then it must be served in accordance with Fed. R. Civ. P. 4(f)(2). Because Iran is not a party to the Hague Convention on Service Abroad of Judicial and Extrajudicial Documents, there is no "internationally agreed upon means" of service, and BSI can only be served using one of the methods outlined in Fed. R. Civ. P. 4(f)(2)(A) through (C) (letter rogatory, letter of request, personal service, or mail). BSI was not served by any of these means. Moreover, it is unnecessary in this case to determine whether Iranian law would prohibit service by mail as plaintiffs, in violation of Rule 4(f)(2)(C)(ii), did not effect service by mail. Consequently, this Court should grant BSI's motion to dismiss for insufficiency of service of process.

#12966430 v16

In plaintiffs' first and second claims, thirty plaintiffs (the American Plaintiffs) bring claims under Section 1605A alleging damages for personal injury arising from the alleged provision by BSI of material support and resources to Hezbollah. Compl. ¶118. Although the complaint alleges in paragraph 57 that more than forty-three civilians were murdered by the Section Lebanon War, which constituted extrajudicial killings within the meaning of 28 U.S.C. §1605A, the American Plaintiffs asserting claims under Section 1605A are not identified as claiming on behalf of decedents or as family members of decedents killed during the Second Lebanon War. Nor do any of the American Plaintiffs claim damages arising from any particularly identified extrajudicial killing. Indeed, none of the American Plaintiffs even allege that they were present at the same time, and at the same place, as any particular extrajudicial killing. Instead, the American Plaintiffs' claims are for various physical injuries and damage occurring during the course of the Second Lebanon War of 2006. See Exhibit H, summarizing the claims of the American Plaintiffs under the FSIA.

The complaint's allegations of extrajudicial killings of others in northern Israel during the Second Lebanon War on diverse dates and in diverse locations does not state a claim under Section 1605A for liability for personal injuries and economic damages to the American Plaintiffs. Section 1605A, by its terms, does not provide—as the American Plaintiffs implicitly assert—a cause of action to any U.S. national claiming damages resulting from any attack by Hezbollah occurring at any location in Israel at any time. Section 1605A, by its terms, requires personal injury or death from a particular act of extrajudicial killing. To state a claim under Section 1605A, a plaintiff must allege more than the American Plaintiffs have in the complaint. Under Section 1605A, a plaintiff must allege, in addition to the other elements of the cause of action, that the plaintiff was injured in an extrajudicial killing, i.e., that they are suing on behalf

of the decedent of, as a family member of the decedent of, or arguably that they were at least present and injured at the same time and place as, the extrajudicial killing.

To be sure, the precise parameters of the cause of action and recovery under Section 1605A remain to be fully determined by the courts. *Estate of Michael Heiser*, 659 F. Supp. 2d 20 (D.D.C. 2009) (considering Section 1605A in the context of that case as akin to a wrongful death statute and providing that recovery for intentional distress is limited to immediate family); *Jenco v. Islamic Rep. of Iran*, 154 F. Supp. 2d 27 (D.D.C. 2001) (under 1605(a)(7)). We are unaware of any non-defaulted action in which plaintiffs have been found to state a claim for relief who were not suing on behalf of the decedent of, were family members of the decedent of, or were present and injured at the same time and place as, the extrajudicial killing. Because none of the American Plaintiffs assert claims of personal injury or death from an extrajudicial killing, the American Plaintiffs' claims under Section 1605A must be dismissed.

## 16. THE COMPLAINT SHOULD BE DISMISSED UNDER RULE 12(B)(6) FOR FAILURE TO STATE A CLAIM AGAINST BSI UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT (28 U.S.C. § 1605A) (FIRST AND SECOND CLAIMS)

The Court should dismiss plaintiffs' first and second claims for relief because plaintiffs fail to allege facts sufficient to support a conclusion that their injuries occurred "by reason of" or were "caused by" any act of BSI. Under the Foreign Sovereign Immunities Act ("FSIA"), plaintiffs can only recover for personal injury or death "caused by" extrajudicial killings or other acts described in Section 1605A(a)(1), or for property loss that occurs "by reason of" such acts. 28 U.S.C. §§ 1605A(c); 1605(d). FSIA's "causation requirement…is satisfied by a showing of proximate cause." *Ben-Rafael v. Islamic Rep. of Iran*, 540 F. Supp. 2d 39, 54 (D.D.C. 2008). Proximate cause exists so long as there is "some reasonable connection

between the act or omission of the defendant and the damages which the plaintiff has suffered." *Id.*

Plaintiffs fail to allege any facts that would establish that their injuries were proximately caused by BSI. The complaint offers only conclusory statements that plaintiffs' injuries were proximately caused by BSI. *See, e.g.,* Compl. ¶¶ 36, 38-39, 46-49, 118-19, 121, 125. This type of "formulaic recitation," unsupported by any factual allegations, is plainly insufficient under *Twombly.* Plaintiffs' first and second claims for relief should accordingly be dismissed under Fed. R. Civ. P. 12(b)(6).

## PART III
## ARGUMENTS UNIQUE TO BSPLC

**17.   PLAINTIFFS' ATA CLAIMS ARE BARRED BY THE ACT OF WAR EXCLUSION (THIRD AND FOURTH CLAIMS)**

The ATA provides that "[n]o action shall be maintained under § 2333 of this title for injury or loss by reason of an act of war." 18 U.S.C. § 2336(a). The term "act of war" is separately defined, in part, as "any act occurring in the course of (A) declared war; (B) armed conflict, whether or not war has been declared, between two or more nations; or (C) armed conflict between military forces of any origin." 18 U.S.C. § 2331(4)(A), (B), and (C). The acts that plaintiffs have alleged as "terrorist attacks" were instead acts that occurred in the course of an armed conflict between Israel and Lebanon.

Because plaintiffs' injuries occurred in the course of armed conflict, namely, the Second Lebanon War, their claims are barred under the ATA's act of war exclusion in 18 U.S.C. § 2331(4)(c). *See. e.g, Stutts v. The De Dietrich Group*, 2006 WL 1867060, *4 (E.D.N.Y. June 20, 2006) (applying the ATA's act of war exclusion to dismiss bank claims brought by contractors injured in the Gulf War).

**18.    THE COMPLAINT SHOULD BE DISMISSED UNDER RULE 12(B)(6) FOR
FAILURE TO STATE A CLAIM AGAINST BSPLC UNDER THE ATA (18 U.S.C.
§ 2333) (THIRD AND FOURTH CLAIMS)**

The Court should also dismiss plaintiffs' claims against BSPLC under the

Antiterrorism Act.  Like plaintiffs' FSIA claims against BSI, both of plaintiffs' ATA claims

against BSPLC offer only "a formulaic recitation of the elements of a cause of action" under the

ATA and lack the factual support required by the Supreme Court's recent jurisprudence.

**A.    Plaintiffs Fail to State an ATA Claim Based on a Primary Liability Theory
(Third Claim)**

Plaintiffs' third claim, which seeks to establish BSPLC's primary or direct

liability under the ATA, fails to state a claim under *Twombly* because plaintiffs fail to allege

facts sufficient to support the required elements of causation and knowledge or intent.  The

ATA's "by reason of" language requires plaintiffs to show that BSPLC's actions were both the

cause-in-fact and the proximate cause of plaintiffs' injuries.  *Strauss v. Credit Lyonnais*, 2006

WL 2862704, at *1 (E.D.N.Y. Oct. 5, 2006); *Weiss v. Nat'l Westminster Bank*, 453 F. Supp. 2d

609, 631 (E.D.N.Y. 2006).  In a post-*Twombly* pleading, plaintiffs cannot rely on conclusory

allegations of causation.  *See, e.g., Schaaf v. Resid. Funding Corp.*, 517 F.3d 544, 549-53 (8th

Cir. 2008) (citing *Twombly* and dismissing claims for failure to establish a causal connection

between defendant's acts and plaintiff's loss); *Univ. of Montreal Pension Plan v. Bank of

America Sec., LLC*, 2007 WL 528703, at *7 (S.D.N.Y. Feb. 20, 2007) (dismissing tort claims

because conclusory proximate cause assertions failed to establish that defendant's actions were a

"substantial factor in the sequence of responsible causation").

Plaintiffs' complaint is devoid of factual allegations that would support a finding

that BSPLC's actions were the cause-in-fact of plaintiffs' injuries.  *See, e.g.,* Compl. ¶ 134

(concluding that plaintiffs' injuries were the "direct and proximate result of the actions" of BSPLC but failing to allege any facts that would support such a conclusion).

The entire theory of plaintiffs' case against BSPLC is that BSPLC participated in transfers of funds to entities that further transferred the funds to benefit Hezbollah, which then used the funds to carry out a terrorist attack that injured plaintiffs. As for "but for" causation, plaintiffs offer only the following:

> But for Defendants' Transfer of Funds to Hezbollah, Hezbollah's ability (a) to build and maintain its operational infrastructure for the planning and execution of the Hezbollah Rocket Barrage; (b) to pay, train, transport and shelter the terrorist operatives who carried out the Hezbollah Rocket Barrage; and (c) to carry out the Hezbollah Rocket Barrage, would have been severely crippled and limited.

*Id.* ¶ 114. This "formulaic recitation" of the cause-in-fact element, unsupported by any factual allegations, is insufficient to state an ATA claim against BSPLC. Moreover, plaintiffs have not, and cannot, credibly allege: (1) that the alleged transfers were Hezbollah's sole or even primary means of income; (2) that Hezbollah actually used the specific funds allegedly transferred to carry out the terrorist attack alleged; (3) that Iran was Hezbollah's primary source for terrorism financing, or even (4) that Hezbollah received the funds allegedly transferred. Because plaintiffs' cause-in-fact allegations are incomplete, conclusory, and entirely unsupported by any factual claims, they do not rise "above the speculative level" rejected in *Twombly.*

Plaintiffs also fail to allege facts that would support a finding that their injuries were proximately caused by BSPLC. Under the ATA, a "showing of proximate cause requires plaintiffs to show that defendant's actions were 'a *substantial factor* in the sequence of responsible causation,' and that the injury was 'reasonably foreseeable or anticipated as a natural consequence.'" *Weiss v. Nat'l Westminster Bank*, 453 F. Supp. 2d 609, 631 (E.D.N.Y. 2006) (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003)) (emphasis added). Yet

-37-

plaintiffs allege no facts that would support a finding that BSPLC's actions were a substantial factor in the attacks described in the complaint, nor any from which the Court could conclude that plaintiffs' injuries were reasonably foreseeable or anticipated as a natural consequence of any act by BSPLC.

Similarly, plaintiffs have failed to plead the required elements of knowledge and intent. An ATA claim under Section 2333(a) requires a plaintiff to plead and prove that the defendant *knew and intended* that its actions would further international terrorism. *See Boim v. Holy Land Found. for Relief and Dev.,* 291 F.3d 1000, 1015 (7th Cir. 2002) (*"Boim I"*) ("such acts would give rise to civil liability under section 2333 *so long as knowledge and intent are also shown.*") (emphasis added); *Stutts*, 2006 WL 1867060, at *2 (dismissing claims against foreign banks where plaintiffs failed to sufficiently allege facts showing the bank defendants' knowledge and intent); *see also Boim v. Holy Land Found. for Relief and Dev.,* 511 F.3d 707, 738 (7th Cir. 2007) ("*Boim II*") (holding that defendant's conduct "would constitute an act of international terrorism for purposes of civil liability under section 2333, *so long as the defendant's knowledge and intent were also shown*") (emphasis added); *Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685, 693 (7th Cir. 2008) ("*Boim III*") ("To give money to an organization that commits terrorist acts is not intentional misconduct unless one either knows that the organization engages in such acts or is deliberately indifferent to whether it does or not…."). The Court should dismiss plaintiffs' claims because the complaint does not allege *any* facts even suggesting that BSPLC intended to further international terrorism in any way or knew that (or was indifferent to whether) the alleged funds transfer would result in plaintiffs' claimed injuries. Under *Twombly*, plaintiffs' conclusory assertions of proximate cause, unsupported by any factual allegations, are insufficient to state an ATA claim.

#12966430 v16

### B. Plaintiffs Fail to State an ATA Claim Based on an Aiding-and-Abetting Theory (Fourth Claim)

Plaintiffs' fourth claim for relief should be dismissed for failure to state a claim against BSPLC for "aiding and abetting" under the ATA, 18 U.S.C. § 2333(a). There is no "aiding and abetting" liability under the ATA. *See Boim III*, 549 F.3d at 689-93 (holding that secondary liability does not exist at all under the ATA due to the absence of express language to provide it). Although there is the potential liability under the ATA for financial "material support" to terrorist organizations (*See Boim III*, 549 F.3d at 690-91), plaintiffs have not alleged material support, only "aiding and abetting." *See* Compl. ¶¶ 136-145. Moreover, as explained above at pages 38-39, plaintiffs have not alleged any facts that would support a finding that BSPLC's acts caused plaintiffs' injuries, that BSPLC knew of the nature of the ultimate recipient of the alleged funds transfer, or that BSPLC intended that the attack take place. Under *Twombly*, plaintiffs' failure to allege these facts is fatal to plaintiffs' ATA claims, which should accordingly be dismissed under Fed. R. Civ. P. 12(b)(6).

### PART IV
### THE ALLEGATIONS OF THE COMPLAINT CONCLUSIVELY ESTABLISH A LACK OF PERSONAL JURISDICTION OVER EITHER BSI[18] OR BSPLC

To establish personal jurisdiction over a foreign corporation at the pleading stage, plaintiffs must allege facts that give rise to a prima facie case that the defendant corporation has "minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Helicopteros Nacionales de Colombia, S. A. v. Hall*, 466 U.S. 408, 414 (1984) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945), other citations omitted); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985);

---

[18] This argument is only applicable to BSI if the Court finds that BSI is not an instrumentality of Iran under the FSIA.

*Bauman v. DaimlerChrysler Corp.*, 579 F.3d 1088, 1094 (9th Cir. 2009) (dismissal appropriate if plaintiff has not made a prima facie showing of personal jurisdiction ); *Kiobel v. Royal Dutch Petroleum Dev. Corp.*, 2008 U.S. Dist LEXIS 16592, *9 (S.D.N.Y. 2008) (to defeat Rule 12(b)(2) motion, plaintiff must make a prima facie showing of jurisdiction).

Where, as here, jurisdiction is asserted pursuant to Fed. R. Civ. P. 4(k)(2), "[w]hether the exercise of jurisdiction is consistent with the Constitution turns on whether a defendant has sufficient contacts with the nation as a whole to satisfy due process." *Mwani v. Bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005) (citing Fed. R. Civ. P. 4(k)); *see also In re Baan Co. Sec. Litig.*, 81 F. Supp. 2d 75, 77 (D.D.C. 2000) ("aliens may claim the Fifth Amendment protection from being haled into an American court in a manner which contradicts traditional (and American) notions of fair play and justice") (citing *Asahi Metal Indus. Co. v. Sup. Ct.*, 480 U.S. 102 (1987), *Helicopteros*, 466 U.S. 408). The Court should be particularly vigilant with respect to determining whether the plaintiffs have established a constitutional basis for jurisdiction over BSI and BSPLC, two foreign banks. Additionally, if there is no other limiting principle on the potential universal jurisdiction of the federal courts (see Part I, Section 4 *supra*), it is found in the constitutional guarantee that to be sued in the United States, a defendant must be "found" here. *Filártega v. Peña-Irala,* 630 F.2d 876 (2d Cir. 1980).

"When a defendant challenges the Court's exercise of personal jurisdiction, it is the plaintiff who bears the burden of establishing a prima facie showing of jurisdiction . . .; however, 'conclusory statement[s] do[] not constitute the prima facie showing necessary to carry the burden of establishing personal jurisdiction....'" *Herero People's Reparations Corp. v. Deutsche Bank AG*, 2003 U.S. Dist. LEXIS 27086, *23 (D.D.C. June 30, 2003) (internal citations omitted).

#12966430 v16

There are two types of personal jurisdiction: specific jurisdiction and general jurisdiction. *Helicopteros*, 466 U.S. at 414. Specific jurisdiction exists when a defendant's acts in the forum give rise to the cause of action. *Id.*; *Mwani v. Bin Laden*, 417 F.3d at 11. General jurisdiction exists where the defendant's contacts with the forum are "continuous and systematic" such that it can be deemed to be present in the forum. *Helicopteros*, 466 U.S. at 416 (citing *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 445 (1952)); *see also In re Baan Co.*, 81 F. Supp. 2d at 83 (for general jurisdiction to attach, "the presence of a corporation . . . in a forum" must be "continuous and deep"); *Clark v. Matsushita Elec. Indus. Corp.*, 811 F. Supp. 1061, 1067 (M.D. Pa. 1993) (contacts must be "pervasive"). In defining general jurisdiction, the Supreme Court stated: "Even when the cause of action does not arise out of or relate to the foreign corporation's activities in the forum state, due process is not offended by a State's subjecting the corporation to its in personam jurisdiction when there are sufficient contacts between the State and the foreign corporation." *Helicopteros*, 466 U.S. at 414 (citing *Perkins*, 342 U.S. 437; *Keeton v. Hustler Mag.*, 465 U.S. 770, 779-780 (1984)).

General jurisdiction does not exist where the defendant has no contact with the forum, or where any contacts are "casual" or "isolated." *Int'l Shoe*, 326 U.S. at 317. General jurisdiction is far more difficult to establish than specific jurisdiction, requiring much more extensive contacts. *Met. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996) ("because general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contacts test" than for specific jurisdiction) (cited in *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 510 n. 2 (D.C. Cir. 2002); *Clark*, 811 F. Supp. at 1067 ("[T]he standard for assertion of general jurisdiction is much higher than that for the assertion of

-41-

specific jurisdiction."); *In re Terrorist Attacks*, Mem. Decision and Order at 16 (S.D.N.Y., June 17, 2010) (hereinafter *In re Terrorist Attacks*) (general jurisdiction test is "stringent").

The stringent nature of the general jurisdiction contacts analysis is heightened when the defendants are foreign corporations. "[T]he Supreme Court has cautioned that the implications for this country's relations with other nations requires a more stringent analysis of the minimum contacts that will satisfy due process than would be appropriate if a domestic corporation is the defendant." *In re Baan Co.*, 81 F. Supp. 2d at 81 (citing *Asahi*, 480 U.S. at 114-115.

Finally—and conclusively for purposes of this case—for general jurisdiction to attach, the foreign defendants' contact with the forum must exist at the time the action is commenced. "Where the cause of action does not relate to or arise out of the foreign defendant's activities, a court may assert general jurisdiction if the defendant has 'continuous and systematic' contacts with the forum *at the time the initial complaint was filed*." *In re Terrorist Attacks*, at 16 (emphasis added). If a foreign corporation does not have a "presence" in the forum at the time the action is commenced, then the assertion of general jurisdiction is not appropriate.

> A foreign corporation must be doing business in the forum with a fair measure of permanence and continuity, as oppose[d] to occasionally or casually, in order to be deemed to have a presence in the forum.

*In re Terrorist Attacks* at 23 (citations omitted); *see also Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 52 (2d Cir. 1991) ("personal jurisdiction depends on the defendant's contacts with the forum state at the time the lawsuit was filed") (citation omitted).

Among the many defendants named in *In re Terrorist Attacks*, one was a foreign bank. The court analyzed the contacts between the bank and the U.S. and then dismissed the complaint against the bank, holding:

-42-

> Neither [the foreign bank's] office or that of its subsidiary was in existence at the time plaintiffs commenced their actions, and accordingly, cannot be relied upon as a basis to demonstrate [the foreign bank's] presence for purposes of general jurisdiction.

*In re Terrorist Attacks* at 26.

Although a court can consider whether contacts exist prior to the time the suit is commenced, whether those contacts still exist at the time the suit is filed is critical to the determination of whether general jurisdiction exists. *Met. Life*, 84 F.3d at 569-570 ("In general jurisdiction cases, district courts should examine a defendant's contacts with the forum state over a period that is reasonable under the circumstances—*up to and including the date the suit was filed*—to assess whether they satisfy the 'continuous and systematic' standard.") (emphasis added). The Supreme Court recognized the importance of this requirement in *Asahi*, where it stated that a foreign corporation "can act to alleviate the risk of burdensome litigation by … severing its connection with the [forum]." *Asahi*, 480 U.S. at 110. In short, without "continuous and systematic" contacts "up to and including" the time of suit, assertion of general jurisdiction over a foreign corporation would violate the Due Process Clause of the 5th Amendment to the U.S. Constitution. *Helicopteros*, 466 U.S. 408; *In re Terrorist Attacks*.

The plaintiffs' own allegations conclusively establish that this Court cannot assert specific or general jurisdiction over Defendants. Paragraphs 21 and 22 of the complaint are in a section captioned "Jurisdiction," yet the allegations in those paragraphs appear to relate solely to subject matter jurisdiction. Viewing the allegations in the complaint in the light most favorable to the plaintiffs, paragraph 22 could be read as an attempt to allege defendants' contacts with the forum. That allegation reads:

> This Court also has subject-matter jurisdiction over the action against defendant BSI by the joint operation of 28 U.S.C. § 1330(a) and Article XI(4) of the *United States – Iran Treaty of Amity, Economic Relations, and Consular Rights*, Aug. 15, 1955,

8 U.S.T. 899 ("Treaty of Amity"), because defendant BSI
"engage[d] in commercial [and] other business activities within the
territories" of the United States during the period in which the
conduct complained of here occurred (2001-2006) and is therefore
not immune from this action.  *Id.*[19]

The only other allegation in the complaint that relates to the actions of defendants is contained in

paragraph 36, which reads:

> Defendants' Transfer of Funds to Hezbollah was carried out by
> defendants in the following manner:  defendant CBI transferred
> funds belonging to defendant Iran to defendant BSI; defendant BSI
> then transferred these funds to defendant BSPLC in London;
> defendant BSPLC then transferred these funds to accounts
> controlled by Hezbollah in branches of defendant BSI in Beirut,
> from which Hezbollah then withdrew these funds.

The complaint does not allege that defendants engaged in any acts in the U.S. that harmed the

plaintiffs.  Indeed, the complaint does not set forth a single act that took place in the U.S.

Consequently, plaintiffs cannot establish specific jurisdiction over BSI or BSPLC.  (In fairness, it

seems they do not attempt to do so.)

The complaint also fails to set forth facts to establish general jurisdiction over

defendants.  The complaint contains the conclusory statement that BSI was "engaged in

commercial [and] other business activity" in the U.S. during the period from 2001 to 2006, but it

does not allege what those activities were.  The complaint does not allege any acts by BSPLC in

the U.S.  Such conclusory allegations are not sufficient to establish a prima facie case of general

jurisdiction over defendants.

Moreover, plaintiffs do not allege any contact that defendants had with the U.S.

after 2006.  This action was commenced in 2010, four years later.  The plaintiffs' own

---

[19]     Plaintiffs erroneously allege that BSI is an instrumentality of Iran.  This mistake is addressed
*supra* at 30-31.

allegations demonstrate that defendants did not have a "presence" in the U.S. at the time the suit was commenced. Consequently, based on the allegations of the complaint, this Court may not exercise general jurisdiction over defendants.

Because the plaintiffs have not set forth any jurisdictional facts, they are not entitled to any jurisdictional discovery. *Deutsche Bank*, 2003 U.S. Dist. LEXIS 27086 (D.D.C. June 30, 2003) (plaintiff who made no effort to allege jurisdictional facts in the complaint cannot survive a motion to dismiss and is not entitled to jurisdictional discovery); *see also Kiobel*, 2008 U.S. Dist. LEXIS at *42-43 ("The Second Circuit has cautioned . . . that courts should not permit additional jurisdictional discovery where plaintiffs have made only "sparse" and "conclusory" allegations of personal jurisdiction.") (internal citation omitted).

## CONCLUSION

For the foregoing reasons, defendants BSI and BSPLC respectfully request that the Court dismiss the complaint with prejudice.

Respectfully submitted,

/Frank C. Razzano/
Frank C. Razzano
Ivan B. Knauer
Jeremy D. Frey
Matthew D. Foster
John C. Snodgrass
PEPPER HAMILTON LLP
Hamilton Square
600 Fourteenth Street, N.W.
Washington, DC 20005-2004
(202) 220-1200

*Counsel for Defendants*
*Bank Saderat Iran and Bank Saderat PLC*

-45-

**CERTIFICATE OF SERVICE**

I certify that on August 23, 2010, I filed the foregoing document via ECF with the understanding that the ECF system would automatically serve counsel for the parties.

/John C. Snodgrass/

#12966430 v16