## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHAIM KAPLAN, *et al.* | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | )   **Civil No. 10-483 (RCL)** |
| | ) |
| CENTRAL BANK OF THE ISLAMIC | ) |
| REPUBLIC OF IRAN, *et al.* | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## <u>MEMORANDUM OPINION</u>

This action arises out of a series of rocket attacks by Hezbollah on civilians in Israel during a 34-day conflict in 2006 along the border between Israel and Lebanon.  Some plaintiffs allegedly suffered injuries in these attacks, others claim to be the family members or personal representatives of the estates of victims.  Defendants Bank Saderat Iran ("BSI") and Bank Saderat, PLC ("BSPLC") allegedly transmitted funds from defendant Iran to Hezbollah.  They moved to dismiss the action.  Defs.'s Mot. to Dismiss, Aug. 23, 2010, ECF No. 15.  For the reasons given below, the Court will GRANT the motion and dismiss all claims against these two defendants and the associated John Does.[1]

---

[1] Other defendants are the Islamic Republic of Iran, the Central Bank of Iran, and associated John Does.

## I.     BACKGROUND

### A.  Factual Background

#### 1. The 2006 Conflict

Between July 12 and August 14, 2006, "Hezbollah fired thousands of rockets and missiles . . . at civilians in northern Israel."  Compl. ¶ 56.  Plaintiffs are American, Israeli, and Canadian civilians who allege that they suffered injuries caused by these rockets, or who allege that they are the family members or personal representatives of four Israeli civilians killed in these attacks.  *Id.* ¶¶ 2, 4–11, 58–111.

In several public statements, Israeli leaders characterized these attacks as part of a "war" with Lebanon:

> On July 12, 2006, describing actions carried out against Israeli Defense Forces on the Lebanese border, Prime Minister Olmert of Israel stated:
>
>> This morning's events were *not a terrorist attack*, but the action of a sovereign state that attacked Israel for no reason and without provocation.  *The Lebanese government, of which Hizbullah is a member,* is trying to undermine regional stability.  Lebanon is responsible and Lebanon will bear the consequences of its actions.
>
> In response to the question—"is there cause to prepare the nation for war and will you call for an emergency government?"—Prime Minister Olmert responded:
>
>> One thing must be understood: *This was an act of war* without any provocation on the sovereign territory—about which there is no dispute—of the State of Israel.  It is absolutely clear to the international community that Israel will respond and that it will respond in an unequivocal fashion that will cause those who started this act of war to bear a very painful and far-reaching responsibility for those actions.

Defs.' Mem. 4–5, ECF No. 15-1 (quoting Defs.' Ex. A, Remarks of Prime Minister Ehud Olmert at a Press Conference, Jul. 12, 2006, ECF No. 15-2, available http://www.mfa.gov.il/MFA/Government/Communiques/2006/PM+Olmert+-

+Lebanon+is+responsible+and+will+bear+the+consequences+12-Jul-2006.htm)        (emphasis

added); *see also* Defs.' Mem. 1 n.1, 4–6 (cataloguing Israeli governmental statements); Pls.'

Opp'n 4–6, ECF No. 20 (acknowledging these statements).   In addition, the Final Report of an

Israeli governmental commission's investigation into the conflict concluded that "Israel initiated

*a long war*, which ended without clear military victory."   Defs.' Mem. 5 (quoting Winograd

Commission   Final   Report   ¶   11,   Jan.   30,   2008,   Defs.'   Ex.   C,   *available   at*:

http://www.cfr.org/publication/15385/winograd_commission_final_report.html, ECF No. 15-4)

(emphasis added). [2]

The conflict seems to have begun when Hezbollah militants entered Israeli territory from

Lebanon and kidnapped and killed several Israeli soldiers.   *See* Defs.' Mem. 4 (quoting Israeli

Prime Minister Olmert's July 12, 2006 response to "actions carried out against Israeli Defense

Forces on the Lebanese border"); *see also* Winograd Commission Final Report ¶ 13 (describing

the Israeli government's decision "made in the night of July 12th to react (to the kidnapping)

with immediate and substantive military action"); *Habchy v. Filip*, 552 F.3d 911, 913 (8th Cir.

2009) (referring to the "the military conflict between Lebanon and Israel in July and August of

2006," and explaining that, according to a State Department report, "this conflict started when

Hizballah militants entered Israel from Lebanese territory and kidnapped and killed three Israeli

soldiers" and then "Israeli military forces entered Lebanese territory in response and instituted a

---

[2] The Court pauses to note that other courts' discussions of these events reflect some terminological inconsistency as to both the nature of the conflict and the identity of the parties to it.  *See, e.g.*, *Mekhael v. Mukasey*, 509 F.3d 326, 327 (7th Cir. 2007) (Posner, J.) (referring in passing to "the *war* between Israel and *Hezbollah* that began on July 12, 2006" (emphases added)); *Delki v. Attorney Gen. of U.S.*, 380 F. App'x 222, 223 (3d Cir. 2010) (noting that an asylum petitioner "explained that a *war* broke out between Israel and *Lebanon* in mid-2006" (emphases added)); *Bassam v. Holder*, 338 F. App'x 507, 510 (6th Cir. 2009) (referring to "the 2006 *conflict* between Israel and *Lebanon*" (emphases added)); *Habchy v. Filip*, 552 F.3d 911, 913 (8th Cir. 2009) (referring to "the *military conflict* between *Lebanon* and Israel in July and August of 2006," and explaining that, according to a State Department report, "this *conflict* started when Hizballah militants entered Israel from Lebanese territory and kidnapped and killed three Israeli soldiers" and then "Israeli military forces entered Lebanese territory in response and instituted a bombing campaign" (emphases added)); *Qassas v. Daylight Donut Flour Co., LLC*, 09-cv-0663, 2010 WL 2365472 (N.D. Okla. June 10, 2010) (referring to the "Israel-*Hezbollah War*" of 2006 (emphasis added)).

bombing campaign" (emphases added)).  As part of the conflict, the Israeli military invaded Lebanon.  Defs.' Mem. 5.  The United Nations brokered a cease fire, ending the conflict on August 14, 2006, *id.* at 5—a date which also marks the conclusion of the rocket attacks at issue in this matter.  Defendant states that, during the course of this conflict, Israel lost 119 soldiers and 43 civilians, while between 250 and 500 Hezbollah members died, and more than 1,000 Lebanese civilians were killed.  Defs.' Mem. 5.

### 2. Hezbollah

Hezbollah is both a terrorist organization and "a political party in Lebanon."  Pls.' Opp'n 3; *see also* Defs.' Mem. 1 n.1, 4 & 7.  Since its establishment in 1982, it has "been controlled, funded and operated by Iran," which has used it to carry out "thousands of terrorist attacks against American and Israeli targets, in which hundreds of innocent victims have been murdered and thousands more maimed."  Compl.  ¶ 29; *see also id.* ¶¶ 30–33 (detailing Hezbollah's terrorist activities).

### 3. Allegations that Defendants Funded Hezbollah

Plaintiffs allege that "[b]etween 2001 and 2006, the defendants herein [including BSI and BSPLC] provided Hezbollah with over $50 million in financial support . . . with the specific intent and purpose of facilitating, enabling and causing Hezbollah to carry out terrorist attacks against American and Israeli targets in order to advance Iran's Policy and Goals."  *Id.* ¶ 35; *see also id.* ¶ 40 (alleging that defendants, including BSI and BSPLC, provided "massive financial support to Hezbollah, and thereby aided and abetted Hezbollah, all with the specific intention of causing and facilitating the commission of acts of extrajudicial killing and international terrorism" and did so "with actual knowledge that Hezbollah had killed and injured numerous U.S. and other civilians in terrorist attacks and with the knowledge and specific intent that

additional U.S. and other innocent civilians would be killed and/or injured as a result . . . .").

Specifically, plaintiffs claim that BSI received Iranian funds from defendant Central Bank of Iran

("CBI") transferred those funds to BSPLC in London who then transferred them to "accounts

controlled by Hezbollah in branches of defendant BSI in Beirut, from which Hezbollah then

withdrew these funds." *Id.* ¶ 36.  In support of this account, plaintiffs point to an October, 2007

U.S. Treasury Department "Fact Sheet," which states that "from 2001 to 2006, Bank Saderat

transferred $50 million from the Central Bank of Iran through its subsidiary in London to its

branch in Beirut for the benefit of Hizballah fronts in Lebanon that support acts of violence."

U.S. Department of the Treasury, Fact Sheet, Oct. 25, 2007, Pls.' Ex. A, ECF No. 3 (cited at

Compl. ¶ 37).

### 4. The Defendants

Defendant Iran is a foreign state and has been continuously designated as a state-sponsor

of terrorism pursuant to section 6(j) of the Export Administration Act of 1979, 50 U.S.C. §

2405(j) since 1984.  Compl. ¶ 13.

Defendant CBI is the central bank of Iran, and is wholly owned by Iran.  Compl. ¶ 14.

Defendant BSI is "an international financial institution headquartered in Iran."  Defs.'

Mem. 2.  The Complaint states that Iran owns "over 90% of the shares" of BSI.   Compl. ¶ 15.

Defendants dispute this, insist that BSI is a "non-government-owned bank," and that the bank

was privatized in 2009, leaving only 49% if its shares with the Iranian government.  Defs.' Mem.

30–31.

Defendant BSPLC is "a bank incorporated in England and Wales and is a wholly owned

subsidiary of BSI."  Defs.' Mem. 3.

### B.  Procedural Background

Plaintiffs filed this action in 2010.  In addition to BSI and BSPLC, plaintiffs also named as defendants the Islamic Republic of Iran and the Central Bank of Iran, as well as a host of "John Does."  The complaint asserts the following four types of claims:

1. Foreign Sovereign Immunities Act's ("FSIA") state-sponsor of terrorism, 28 U.S.C. 1605A(c), claims by the American plaintiffs against Iran, CBI, and BSI (but not BSPLC), Compl. ¶¶ 117–26 (Counts I & II);

2. Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), claims by the American plaintiffs against BSPLC (but not BSI), Compl. ¶¶ 127–45 (Counts III & IV);

3. Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, claims by the non-American plaintiffs against BSI and BSPLC, Compl. ¶¶ 146–153 (Count V); and

4. Israeli Tort claims by all plaintiffs against BSI and BSPLC, Compl. ¶¶ 154–73 (Counts VI & VII).

BSI and BSPLC filed the instant motion to dismiss in August of 2010.  Defs.' Mot., ECF No. 15. The case was reassigned by consent from Judge Roberts to the undersigned in June 2013.  ECF No. 38.

## II.    SUBJECT MATTER JURISDICTION

BSI and BSPLC challenge this Court's subject matter jurisdiction over the entire complaint on three grounds: political question, standing, and the Act of State doctrine.[3]  *See* Defs.' Mem. 3–16; Defs.' Reply 3–5.  This Court may advance to consider the merits only if it finds jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (rejecting the doctrine of "hypothetical jurisdiction"—whereby a court could skip over jurisdictional questions to consider the merits of a case—as "beyond the bounds of authorized judicial action " and stating that it "offends fundamental principles of separation of powers.").

---

[3] Defendants also assert other, narrower grounds for lack of subject matter jurisdiction over particular claims, which are addressed below.

**A.  Plaintiffs' Claims Do Not Present a Non-Justiciable Political Question**

BSI and BSPLC argue that the case presents a non-justiciable political question because, if the action proceeds, the Court "will have to decide whether the attacks complained of by plaintiffs were acts of war, as the Israeli government described them, or were instead acts of terrorism, as the complaint seeks to characterize them"—a determination that would risk interfering with American foreign policy.  Defs.' Mem. 5, 3–10; *see also* Defs.' Reply 3–4.  The Court rejects this argument.

In *Baker v. Carr*, the Supreme Court explained that a case should be dismissed as a non-justiciable political question if any one of the following six factors is present:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department;
> [2] . . . a lack of judicially discoverable and manageable standards for resolving it;
> [3] . . . the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;
> [4] . . . the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;
> [5] . . . an unusual need for unquestioning adherence to a political decision already made; or
> [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. 186, 217 (1962).  The doctrine has been criticized as "amorphous," *Morgan v. United States*, 801 F.2d 445, 447 (D.C. Cir. 1986) (Scalia, J.), "not fully defined," *Conyers v. Reagan*, 765 F.2d 1124, 1126–27 (D.C. Cir. 1985) (Tamm, J.); and "murky and unsettled." *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 803 n.8 (D.C. Cir. 1984) (Bork, J., concurring). Happily, the Supreme Court has provided some recent guidance in a case which, like the present one, implicated sensitive issues of American foreign policy.  *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1423 (2012).

*Zivotofsky* addressed a conflict between section 214 of the Foreign Relations Authorization Act, Fiscal Year 2003, Pub. L. No. 107-228, 116 Stat. 1350 (2002), which provided that U.S. Passports of citizens born in Jerusalem would indicate the place of birth as Israel, and the official U.S. State Department policy directing passport officials to record such individuals' place of birth only as Jerusalem. 132 S. Ct. at 1425. But neither the District Court nor the D.C. Circuit reached the core question of the case—whether the statute "impermissibly intrudes upon Presidential powers under the Constitution." *Id.* at 1428. Instead, both lower courts found that the case "involve[d] a political question because deciding [the] claim would force the Judicial Branch to interfere with the President's exercise of constitutional power committed to him alone." *Id.* at 1427.

The Supreme Court reversed. Because the plaintiff did "not ask the courts to determine whether Jerusalem is the capital of Israel" but only "whether he may vindicate his statutory right . . . to choose to have Israel recorded on his passport as his place of birth," there was no political question bar to jurisdiction. *Id.* The Court explained that the federal courts were "not being asked to supplant a foreign policy decision of the political branches with the courts' own unmoored determination of what United States policy toward Jerusalem should be" but rather to engage in the "familiar judicial exercise" of determining whether the statute is constitutional. *Id.* Such determinations fall squarely within the province of the judiciary. Thus, there was no "textually demonstrable constitutional commitment" to the President preventing the Court from taking jurisdiction. *Id.* at 1428. Nor was there a lack of "judicially discoverable and manageable standards" to resolve the case, as "both sides offer[ed] detailed legal arguments regarding whether [the provision wa]s constitutional in light of powers committed to the Executive, and whether Congress's own powers with respect to passports must be weighed in analyzing the

8

question." *Id.* at 1429.  True, the resolution of the case "demand[ed] careful examination of the textual, structural, and historical evidence put forward by the parties regarding the nature of the statute and of the passport and recognition powers," but, the Court held, "[t]his is what courts do." *Id.* at 1430.

Under these principles, the present case does not present a non-justiciable political question.  As in *Zivitofsky*, the plaintiffs in this action do not ask the Court to "supplant a foreign policy decision of the political branches with the courts' own unmoored determination" of whether the rocket attacks at issue here were examples of "war" or "terrorism," *see id.* at 1427, but rather seek relief under several federal statutes authorizing recovery for specific conduct. Drawing a clean line between "war" and "terrorism" may be a difficult and sensitive political issue.  Fortunately, it is one that Congress has completed—leaving it to the Court to apply their definition.  The Court must only decide whether the rocket attacks qualify as "war" or "terrorism" as those terms are defined under the legal frameworks plaintiffs invoke.  For instance, plaintiffs' cause of action under the ATA will depend on whether the underlying actions meet the statutory definitions of "an act of international terrorism" or an "act of war" at 18 U.S.C. § 2331.  And plaintiffs' cause of action under the FSIA will depend on whether the killings qualify as an "extrajudicial killing" as defined by 28 U.S.C. § 1605A(h)(7).  Far from any "textually demonstrable constitutional commitment" of this determination to another branch, the task of applying these definitions to specific circumstances has been directly delegated to the courts under the aforementioned statutes.  Nor, for the same reason, is there an absence of "manageable standards" to decide the case.  The Court will only have to engage in the "familiar judicial exercise" of interpreting the applicable statutory provisions and decide whether each one permits plaintiffs to move forward with their action based on the particular facts alleged.  *See*

*Zivotofsky*, 132 S. Ct. at 1429.  And, as in *Zivotofsky*, the Court will be guided in this exercise by the "detailed legal arguments" provided by both sides on these questions.  *See id.* at 1429. Accordingly, the Court finds that this action does not present a non-justiciable political question.

### B.  Plaintiffs Have Article III Standing

BSI and BSPLC also move to dismiss the complaint for lack of Article III standing. They argue that plaintiffs' injuries are "too attenuated from any alleged act or omission" by the banks and therefore are not "fairly traceable" to their financial activities.  Defs.' Mem. 14; *see also* Defs.' Reply 4–5.  The Court rejects this argument.

Article III of the Constitution limits federal courts' jurisdiction to certain "Cases" and "Controversies." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013).  "One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue." *Id.* (quotations omitted).  The requirements of Article III standing are familiar:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*United States v. Windsor*, 2013 WL 3196928, at \*7 (U.S. June 26, 2013) (quotations, citations, and modifications omitted).  The plaintiffs, as the party invoking federal jurisdiction, bear the burden of establishing these three elements.  *Devlin v. Scardelletti*, 536 U.S. 1, 6–7 (2002). When ruling on a motion to dismiss under Rule 12(b)(1) for lack of standing, courts "must accept as true all material allegations of the complaint, drawing all reasonable inferences from those allegations in plaintiffs' favor, and presuming that general allegations embrace those

specific facts that are necessary to support the claim."[4]  *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011) (internal citations and quotations omitted).

To satisfy the "fairly traceable" requirement, the "line of causation" between the illegal conduct and injury must not be "too attenuated."  *Allen v. Wright*, 468 U.S. 737, 752 (1984). While "[t]he fact that the harm to [plaintiffs] may have resulted indirectly does not in itself preclude standing . . . , it may make it substantially more difficult to meet the minimum requirement of Art. III: to establish that, in fact, the asserted injury was the consequence of the defendants' actions . . . ."  *Warth v. Seldin*, 422 U.S. 490, 504–05 (1975).  The D.C. Circuit has translated the requirement into a single question: "did the [defendant]'s actions materially increase the probability of injury"?  *Huddy v. FCC*, 236 F.3d 720, 722 (D.C. Cir. 2001).

---

[4] This language is drawn from the second sentence of the following paragraph:

> We review *de novo* the district court's dismissal for lack of standing and failure to state a claim upon which relief can be granted. . . . At this stage of the litigation, we "must accept as true all material allegations of the complaint," drawing all reasonable inferences from those allegations in plaintiffs' favor, *Warth* [*v. Seldin*], 422 U.S. [490,] 501 [(1975)], and "presum[ing] that general allegations embrace those specific facts that are necessary to support the claim," *Lujan* [*v. Defenders of Wildlife*], 504 U.S. [555,] 561 [(1992)]. And in assessing plaintiffs' standing, we must assume they will prevail on the merits of their constitutional claims.

*LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011) (Tatel, J.).  It might be argued that the language from the second sentence quoted in the body of this opinion concerns only 12(b)(6) motions, not 12(b)(1) motions since the introductory sentence mentions both types of motions and the key language is followed by a sentence that expressly concerns only 12(b)(1) motions.  On the other hand, the second sentence is punctuated with quotations and citations to two of the Supreme Court's pivotal cases on standing.  In addition, if this were intended as a statement of the 12(b)(6) standard, it would be an odd one—making no mention of the heightened "plausibility" standard imposed by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  While "[s]ome district and circuit courts have begun to apply the 'plausibility standard' [from] for factual allegations in all motions to dismiss, including motions to dismiss for lack of subject matter jurisdiction," the D.C. Circuit has apparently not done so.  5B Fed. Prac. & Proc. Civ. § 1350 & n.51.1 (3d ed.) (collecting cases from the Second, Third, Fifth, and Eighth Circuits).

Accordingly, the Court will treat this second sentence as the standard for evaluating plaintiff's allegations in 12(b)(1) motions.  In any event, the issue is not outcome determinative here, since plaintiffs' core jurisdictional allegations would be sufficient under even the heightened "plausibility" pleading standard.

## 2. Victim Standing To Sue Financial Institutions For Funding Terrorist Groups

There appears to be no binding precedent addressing the Article III standing of terror-victims to sue a financial institution for providing funds to the responsible terrorist group. However, several other courts have ruled on the issue.

In *Rothstein v. UBS AG*, the Second Circuit held that plaintiffs—victims and family members of victims of Hamas and Hezbollah terror-attacks in Israel between 1997 and 2006—had standing to sue the bank UBS based on plausible allegations that

> Iran provided Hamas and Hizbollah with hundreds of millions of dollars to fund terrorist attacks; that Iran conditioned that funding on agreement by those organizations to conduct terrorist attacks on Israel and its residents; . . . that the bombings and rocket attacks between July 1997 and July 2006, in which plaintiffs and/or their family members were injured, were conducted by Hizbollah or Hamas; . . . that Hizbollah and Hamas needed large sums of money to fund their operations; that those organizations, by reason of their nature and the existence of counterterrorism sanctions, could not freely use normal banking services such as checks or wire transfers; . . . that U.S. currency is a universally accepted form of payment; . . [and] that between 1996 and 2004, in violation of United States laws, UBS provided Iran with hundreds of millions of dollars in cash . . . .

708 F.3d 82, 87 (2d Cir. 2013). The court emphasized that the "fairly traceable" causation standard is lower than the "proximate cause" standard of tort liability,[5] and held that, accordingly the fact that Iran also obtained U.S. currency from other sources during this period did not deprive plaintiffs of standing to sue. *Id.* at 91–92 (citing *Massachusetts v. EPA*, 549 U.S. 497, 524 (2007)).

---

[5] In fact, several circuits have explicitly recognized that the "fairly traceable" requirement is less demanding that the tort law concept of "proximate" cause. *See, e.g., Barbour v. Haley*, 471 F.3d 1222, 1226 (11th Cir. 2006); *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 122 n.8 (2d Cir. 2003); *Natural Res. Def. Council, Inc. v. Watkins*, 954 F.2d 974, 980 n.7 (4th Cir. 1992); *Pub. Interest Research Grp. of New Jersey, Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 (3d Cir. 1990). The D.C. Circuit has apparently not done so, but several district judges in this circuit have adopted this view. *See, e.g., Flaherty v. Bryson*, 850 F. Supp. 2d 38, 50 (D.D.C. 2012) (Kessler, J.); *Nat'l Treasury Employees Union v. Whipple*, 636 F. Supp. 2d 63, 73 (D.D.C. 2009) (Roberts, J.); *Nader v. The Democratic Nat. Comm.*, 555 F. Supp. 2d 137, 149–50 (D.D.C. 2008) (Urbina, J.) *aff'd on other grounds*, 567 F.3d 692 (D.C. Cir. 2009); *N. Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 83 (D.D.C. 2007) (Bates, J.).

In *Wultz v. Islamic Republic of Iran*, this Court found that plaintiffs—family members of a terror-attack victim—had standing to sue the Bank of China based on allegations that for three years preceding the attack the bank had "executed dozens of dollar wire transfers for the [terrorist group responsible], totaling several million dollars"; the transfers "were initiated by the [group's] leadership . . . and were executed by and through [the bank's] branches in the United States"; the transferred moneys were "received into accounts owned by officers and agents of the [terrorist organization] and used for the purpose of planning, preparing for, and executing terrorist attacks"; that "Israeli officials . . . informed China, which informed BOC, that the transfers were enabling the terrorist activities of the [terrorist group]"; that the group in question was subject to "strict economic sanctions programs imposed by the United States" which were followed by most financial institutions and which, if "universally enforced," would "severely restrict[]" the group's ability to conduct its activities; and that the transfers at issue were "necessary for planning preparing and carrying out the attack for which relief is sought." 755 F. Supp. 2d 1, 18, 21–23 (D.D.C. 2010).

### 3. Analysis

Under these principles, plaintiffs have alleged facts sufficient to establish standing. Plaintiffs allege that, during the relevant time period, Iran funded and controlled Hezbollah, Compl. ¶ 29, used Hezbollah to conduct terrorist attacks against civilians in Israel, including the attacks that injured and killed plaintiffs and their family members, *id.* at ¶ 56, and used BSI (90% Iranian-owned) and BSPLC (wholly owned by BSI) to transfer over $50 million to Hezbollah, *id.* at ¶ 35–36. Plaintiffs rely on a 2007 U.S. Treasury Department "Fact Sheet," which supports the last of these allegations. *Id*. at ¶ 37. These allegations are sufficient to show that BSI and

BSPLC "materially increase[d] the probability of [plaintiffs'] injury" by funneling substantial funds from a state sponsor of terror to a known terrorist group. *See Huddy*, 236 F.3d at 722.

Defendants protest that plaintiffs' injuries are "far more closely tied to acts of unidentified third parties—without whose 'independent action' plaintiffs would not have been injured, namely, those who allegedly planned and carried out the attacks." Def.'s Mem. 16. But, an indirect causal chain may still be a valid causal chain for standing purposes. *See Warth*, 422 U.S. at 504–05 ("[t]he fact that the harm to [plaintiffs] may have resulted indirectly does not in itself preclude standing"). Moreover, plaintiffs' allegations (which, at this stage, this Court must "accept as true," *LaRoque*, 650 F.3d at 785), are that the "third party" actions here (*i.e.* Hezbollah's rocket attacks) are not really "independent" at all from the fund transfers, but rather the transfers were completed by BSI and BSPLC in furtherance of Iran's agenda to promote Hezbollah's terror attacks on Israel. Compl. ¶ 35. This claim is supported by plaintiffs' allegations that Iran created, funded and controlled Hezbollah and used that organization to commit terror attacks against Israel; that BSI was (or is) 90% owned by Iran; and that BSPLC was wholly owned by BSI. "[D]rawing all reasonable inferences from those allegations in plaintiffs' favor," as this Court is obliged to do at this stage, *see LaRoque*, 650 F.3d at 785, the Court finds that plaintiffs have met their burden to establish standing.

Notably, plaintiffs' allegations here seem to provide an even stronger causal chain than that approved by the Second Circuit in *Rothstein*, where the defendant bank was accused only of making illegal financial transfers, not of being in any deeper way enmeshed in the terrorist purposes of the beneficiaries of those transfers. *See Rothstein*, 708 F.3d at 87. Rather, plaintiffs' causal chain is like the one found sufficient by this Court in *Wultz*, where this Court emphasized that the defendant bank had actual knowledge that the funds transfer would benefit a terrorist

14

entity. 755 F. Supp. 2d at 18. Because plaintiffs' allegations are sufficient to establish a "line of causation" between the conduct by BSI and BSPLC and their injuries that is not "too attenuated," they have standing to bring these claims against BSI and BSPLC. *See Allen*, 468 U.S. at 752.

### C.  The Act of State Doctrine Does Not Apply

BSI and BSPLC also argue that plaintiffs' claims are barred under the Act of State Doctrine. Defs.' Mem. 10–14; *see also* Defs.' Reply 3–4. The Court rejects this argument.

#### 1.  Legal Standard

"The act of state doctrine 'precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory.'" *McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1073 (D.C. Cir. 2012) *cert. denied*, 133 S. Ct. 1582 (U.S. 2013) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964)). The doctrine applies when "the relief sought or the defense interposed would [require] a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp.*, 493 U.S. 400, 405 (1990). "Act of state issues only arise when a court *must decide*—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign." *Id.* at 406. "When it applies, the doctrine serves as a 'rule of decision for the courts of this country,' which requires courts to deem valid the acts of foreign sovereigns taken within their own jurisdictions." *McKesson Corp.*, 672 F.3d at 1066 (quoting *Kirkpatrick*, 493 U.S. at 406, 09).

#### 2.  Analysis

Defendants invoke the Act of State doctrine because, they claim, "[f]or plaintiffs' claims to succeed, the Court will be required to determine the validity of Israel's contention that a state

of war (namely, the Second Lebanon War) existed at the time of the attacks described in the complaint" or whether those acts were instead "solely . . . act[s] of terrorism by Hezbollah." Defs.' Mem. 10–14; *see also* Defs.' Reply 3–4.

This is incorrect. Even if the Israeli government's statements characterizing the rocket attacks as "war" are construed as "public acts a recognized foreign sovereign power committed within its own territory," *McKesson*, 672 F.3d at 1073, the Act of State doctrine does not apply here because the court need not really "inquire into the validity" of those statements. *Id.* Plaintiffs' claims depend, in part, on whether the rocket attacks fit into *specific legal* definitions of "terrorism" or "war." *Cf.* Defs.' Mem. 11–12 ("[P]laintiffs are asking the Court to determine whether these killings resulted from terrorism or war."). The Court may resolve these legal questions without addressing the "validity" of the Israeli statements which, despite using some of the same terms, did not sound in any of the legal frameworks plaintiffs invoke here. *See McKesson*, 672 F.3d at 1073. Contrary to defendants' mischaracterization, a finding that the rocket attacks fit into, say, the ATA's definition of "international terrorism" would not "overrule" the Israeli description of the attacks as "war" because these statements did not purport to rely on that specific legal definition. *See* Defs.' Mem. 12.

Defendants' cases are not to the contrary. In *Saltany v. Reagan*, the late Judge Thomas Penfield Jackson found that the Act of State doctrine barred a claim against the United Kingdom based on that government's decision to "allow its territory to be utilized by [the United States] . . . to mount a military operation against [Libya]." 702 F. Supp. 319, 320 (D.D.C. 1988) *aff'd in part, rev'd in part*, 886 F.2d 438 (D.C. Cir. 1989) (discussed at Defs.' Mem. 12–13). And, in *Roe v. Unocal Corp.*, then-district judge Richard Paez found that the Act of State doctrine barred an action based on an alleged collaboration between the Burmese Military and a private

16

company. 70 F. Supp. 2d 1073 (C.D. Cal. 1999) (discussed at Defs.' Mem. 13–14).  While the *Saltany* claim would have turned on the legality of the UK's decision, and the *Unocal* claims would have turned on the legality of the Burmese Military's actions and orders, the present claims do not turn on the legality of any Israeli actions, and instead, turn only on questions that the Israeli government has never purported to address: whether the rocket attacks qualify under certain legal definitions.  Accordingly, the Act of State doctrine does not apply.

### III.    ISRAEL AND LEBANON ARE NOT INDISPENSABLE PARTIES

BSI and BSPLC also move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(7) for failure to join Israel and Lebanon as "indispensable parties."  Defs.' Mem. 29; Defs.' Reply 12.  BSI and BSPLC argue that because the Court "would have to find as a matter of fact that plaintiffs were injured by acts of terrorism," rather than what the Israeli government has termed a "war" with Lebanon, "[b]oth Israel and Lebanon . . . have an interest in the subject matter of this litigation, i.e., whether a state of war existed or not."  Defs.' Mem. 29; *see also* Defs.' Reply 12 ("Because this case involves claims relating to military attacks that resulted in civilian casualties during a war between two sovereign states, Israel and Lebanon, it invariably and squarely implicates their interest in the outcome of the litigation.").

This argument fails for the same reason the Political Question and Act of State arguments failed: while the Court will have to determine whether the rocket attacks were "terrorism" or "war" under the various specific legal frameworks plaintiffs invoke here, these determinations do not directly implicate the Israeli statements, which did not invoke the legal frameworks plaintiffs rely on here.  Israel and Lebanon are not indispensable parties.

## IV.    PLAINTIFFS' FOREIGN SOVEREIGN IMMUNITIES ACT CLAIMS FAIL

The American plaintiffs assert claims under the updated state-sponsor of terrorism provision of the Foreign Sovereign Immunities Act against Iran, CBI and BSI (not BSPLC). Compl. ¶¶ 117–35 (Counts I & II).   BSI moves to dismiss these claims against it under Federal Rule of Civil Procedure 12(b)(6).  The Court grants the motion and dismisses the claims against BSI.  It does not address the claims against CBI or Iran.

### A.  Legal Standard

The FSIA provides a cause of action for money damages that nationals of the United States[6] may bring against "foreign state" sponsors of terror for "personal injury or death caused by," *inter alia*, "extrajudicial killing[s]"[7] or "the provision of material support or resources for such an act."[8]  28 U.S.C. § 1605A(c).   Under the FSIA, a "foreign state" includes "an agency or instrumentality of a foreign state," which is a "separate legal person . . . a majority of whose . . . ownership interest is owned by a foreign state or political subdivision thereof."  28 U.S.C. § 1603(a) & (b). "[I]nstrumentality status [is] determined at the time suit is filed," rather than at the time of the alleged incident.  *Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2003).

### B.  Analysis

Defendants claim that Iran has owned less than half of BSI's shares since 2009—well before the present lawsuit was filed.  Defs.' Mem. 30–31.  Plaintiffs do not contest this claim.

---

[6] Or members of the armed forces, government employees, government contractors, and their legal representatives. § 1605A(c)(1)-(4).

[7] The FSIA authorizes suits for, inter alia, "extrajudicial killing[s]"—a term which is defined as excluding "any such killing that, under international law, is lawfully carried out under the authority of a foreign nation." § 1605A(h)(7) (incorporating definition of the term from section 3 of the Torture Victim Protection Act of 1991, 28 U.S.C. § 1350 note).  If and when plaintiffs move for default judgment against CBI and Iran on this claim, they will have to show that the deaths that resulted from the rocket attacks violated the international law of war.

[8] The statute limits liability to cases in which the act is performed, or the support is provided "by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." § 1605A(c).

Pls.' Opp'n 15 (noting defendants' argument and conceding that "[i]f BSI is not an agency or instrumentality of Iran . . . then the FSIA claims against BSI would indeed need to be dismissed."). Thus, the Court agrees with defendants. Under *Dole Food*'s interpretation of § 1603(b), BSI is not an "agency or instrumentality" because it was not majority-owned by a foreign state at the time the suit was filed. Accordingly, plaintiffs' FSIA claims against BSI will be dismissed.

## V.    PLAINTIFFS' CLAIMS UNDER THE ANTI-TERRORISM ACT FAIL

The American plaintiffs assert claims under the ATA, 18 U.S.C. § 2333(a), against BSPLC (not BSI). Compl. ¶¶ 127–45 (Counts III & IV). Defendants move to dismiss these claims under Federal Rule of Civil Procedure 12(b)(6). The Court grants the motion and dismisses the claims.

### A. Legal Standard

The ATA provides that "[a]ny national of the United States injured in his or her person . . . by reason of *an act of international terrorism*, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees." 18 U.S.C. § 2333(a) (emphasis added). However, "[n]o action shall be maintained . . . for injury or loss by reason of *an act of war*." *Id.* § 2336(a) (emphasis added). "Act[s] of international terrorism"

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
> (B) appear to be intended--
> > (i) to intimidate or coerce a civilian population;
> > (ii) to influence the policy of a government by intimidation or coercion; or
> > (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
> (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are

accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

§ 2331(1). An "act of war" is defined as "any act occurring in the course of . . . (B) armed conflict, whether or not war has been declared, between two or more nations; or (C) armed conflict between military forces of any origin." § 2331(4).

The statute leaves open several procedural and substantive issues on which there is apparently no binding circuit precedent.

### 1. Procedural Issues

There is some confusion as to where the "act of war" exclusion, § 2336, fits in the procedural posture of a case. Courts have variously treated it as (1) a bar to subject matter jurisdiction; (2) a definition of an element of the claim; and (3) an affirmative defense. *Compare Estate of Klieman v. Palestinian Auth.,* 424 F. Supp. 2d 153, 162–63 (D.D.C. 2006) (Friedman, J.) (treating § 2336 as a jurisdictional bar), *and Biton v. Palestinian Interim Self-Gov't Auth.,* 412 F. Supp. 2d 1, 7 (D.D.C. 2005) (Collyer, J.) (same), *with Stutts v. De Dietrich Grp.,* 03-cv-4058, 2006 WL 1867060 (E.D.N.Y. June 30, 2006) (treating § 2336 as defining an element of the claim), *with Sokolow v. Palestine Liberation Org.,* 583 F. Supp. 2d 451, 458–59 (S.D.N.Y. 2008) (declining to decide whether § 2336 is a jurisdictional bar or an element), *and with Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 508 (E.D.N.Y. 2012) (Weinstein, J.) (treating § 2336 as an affirmative defense), *and Morris v. Khadr*, 415 F. Supp. 2d 1323, 1334 (D. Utah 2006) ("[T]he burden should fall on [defendant] to prove that his associates were a military force if he wishes to invoke this ATA exclusion."). Defendants are similarly unclear on this front, stating only that plaintiffs' claims "are barred" under the ATA's act of war exclusion. Defs.' Mem. 35; *see also* Defs.' Reply 13 (same). Plaintiffs adopt the same language. Pls.' Opp'n 15–16.

The Court need not resolve this procedural question. First, the distinction between an affirmative defense and an element of the claim is not significant. Because the defendants argue that the allegations contained in the complaint are sufficient to satisfy the exception, it would not make any difference on the present motion to dismiss whether the Court were to treat the exception as an affirmative defense or as an element. *See Jones v. Bock,* 549 U.S. 199, 215 (2007) ("Whether a particular ground for opposing a claim may be the basis for dismissal for failure to state a claim depends on whether the allegations in the complaint suffice to establish that ground, not on the nature of the ground in the abstract.").

Second, the distinction between an element of the claim and a jurisdictional bar might be more significant. The heightened "plausibility" standard of *Ashcroft v. Iqbal,* 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) applies to the former, but, while "[s]ome district and circuit courts have [also] begun to apply [this standard] for factual allegations in . . . motions to dismiss for lack of subject matter jurisdiction," 5B Fed. Prac. & Proc. Civ. § 1350 & n.51.1 (3d ed.), the D.C. Circuit has apparently not done so. *See LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011) (discussed *supra* note 4). As discussed below, the Court finds that even under the looser standard under 12(b)(1), plaintiffs' ATA claims fail. Accordingly, it need not decide whether the act of war exclusion is jurisdictional or part of the claim.

### 2. Substantive Issues

Defendants do not specify which subsection(s) of § 2331(4) they rely on. Defs.' Mem. 35. As discussed below, the Court finds that subsections (B) and (C) are both relevant.

Subsection (B) applies the act of war exception to acts "occurring in the course of . . . armed conflict . . . between . . . nations." § 2331(4)(B). Subsection (C) applies the exception to

21

acts "occurring in the course of . . . armed conflict between military forces of any origin." § 2331(4)(C).

The phrase "in the course of" poses some difficulty. Some judges in this district have interpreted this phrase as incorporating *sub rosa* the "established norms of warfare and armed conflict under international law." *Klieman*, 424 F. Supp. 2d at 166 (Friedman, J.) ("[A]n act that violates established norms of warfare and armed conflict under international law is not an act occurring in the course of armed conflict."); *see also Biton*, 412 F. Supp. 2d at 10–11 (Collyer, J.) (because an attack targeted children who are "not proper targets of war," the attack "did not occur 'during [*sic*] the course of' an armed conflict as a matter of law"). Such a move is appealing as it provides significant guidance in an otherwise open-ended statutory regime: any act that violates the international laws of war does not qualify for the exception. Unfortunately, such a move is not justified here: Congress knows how to invoke international law and the law of war, having done so explicitly in some of the other statutes relied on by plaintiffs in this case. *See, e.g.*, FSIA, 28 U.S.C. § 1605A(h)(7) (incorporating a definition of "extrajudicial killing" from the Torture Victim Protection Act of 1991 that expressly excludes "any such killing that, under international law, is lawfully carried out under the authority of a foreign nation."); *see also Gill*, 893 F. Supp. 2d at 514 (making the same point, and collecting additional examples). It declined to do so in this provision, and the Court should not step in to do so. This Court declines to follow Judges Friedman and Collyer by importing wholesale the international law of war into the statute by way of the phrase "in the course of."

The undefined terms "military forces" and "armed conflict" of subsection (C) also pose difficulties. Because subsection (B) already covers all armed conflict between nations, the term must include non-national forces—or it would be rendered mere "surplusage." *See, e.g.*, Antonin

22

Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174–79 (2012) (discussing the "Surplusage Canon": "If possible, every word and every provision is to be given effect . . . None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence."); *see also Gill*, 893 F. Supp. 2d at 512 (reaching the same conclusion regarding subsection (C)); *Weiss v. Arab Bank, PLC*, 2007 WL 4565060, *5 (E.D.N.Y. Dec. 21, 2007) ("[S]ubection (C) extends the 'act of war' exclusion to armed conflicts between military forces that are not the military forces of recognized nations."); *but see Morris*, 415 F. Supp. 2d at 1334 (noting that "military" is conventionally defined as the armed forces "*of a nation*," and concluding that al Qaeda did not qualify as a "military force" because it "is not a 'nation'").   But subsection (C) must not be read so broadly as to encompass *all* of the acts that otherwise qualify as "international terrorism" under § 2331(1); doing so would entirely eviscerate § 2333(a), which provides a cause of action for victims of such acts.   *See* Scalia & Garner, Reading Law, at 63 (discussing the following "presumption against ineffectiveness": "A textually permissible interpretation that furthers rather than obstructs the document's purpose should be favored.").   In sum, subsection (C) may exclude some, but cannot exclude all, acts by non-national groups that otherwise form the basis for a valid claim under the ATA: *i.e.* "violent" acts that "appear to be intended to intimidate or coerce a civilian population; to influence the policy of a government by intimidation or coercion; or to affect the conduct of a government by mass destruction . . . ." § 2331(1).

### 3.   Past Applications

While there is no binding circuit precedent interpreting the act of war exemption, several judges, in and outside of this circuit, have decided cases interpreting this provision.

Several judges have found that attacks on civilians in Israel by Palestinian terrorist groups were not covered by the act of war exemption.  In *Biton*, Judge Collyer considered a November 2000 bus bombing in a former Israeli settlement in the Gaza Strip that was alleged to be part of the "al-Aqsa Intifada," "a series of violent demonstrations and clashes between Palestinians and Israeli Defense Forces that ensued following . . . Ariel Sharon's controversial visit to the Temple Mount . . . in Jerusalem in September 2000."  412 F. Supp. 2d at 3.  She concluded that this bombing was not an "act of war" because the bus contained "only children and teachers" and "children are not the proper targets of war."[9]  412 F. Supp. 2d at 10. Similarly, in *Klieman*, Judge Friedman considered a 2002 attack on an Israeli civilian bus in the West Bank.  424 F. Supp. 2d at 155–56.   Although defendants asserted that there was "ongoing and daily armed conflict between the Israeli military and Palestinian military forces throughout the West Bank and Gaza during the relevant period," and that "the Israeli government consistently has characterized the fighting as armed conflict," *id.* at 163 (quotations and citations omitted), Judge Friedman declined to decide whether there was "armed conflict between military forces of any origin," § 2331(4)(C), during this period.  *Klieman*, 424 F. Supp. 2d at 163. Instead, he concluded that because the attack targeted a bus containing only civilian non-combatants, it could not have occurred "in the course of" any such conflict.[10]  *Id.* at 167; *see also Sokolow*, 583 F. Supp. 2d at 454–55, 459 (concluding that seven attacks on civilians in Israel over a three year period, allegedly committed by the Palestinian Liberation Organization did not qualify for the act of war exemption, notwithstanding defendants' arguments that "the persistence of violence, between Israelis and Palestinians in the West Bank and Gaza Strip,

---

[9] As discussed above, the Court rejects Judge Collyer's reading of the statute as incorporating the international laws of war.

[10] Again, as discussed above, the Court rejects Judge Friedman's reading of the statute as incorporating the international laws of war.

constitute[d] 'armed conflict' under the ATA," and that "the attacks were not intended as acts of terrorism" but rather "an attempt to end the illegal occupation of these territories." (citing Judge Friedman's opinion in *Klieman*, 424 F. Supp. 2d at 167, and Judge Collyer's opinion in *Biton*, 412 F. Supp. 2d at 10–11)).

More recently, in *Gill*, Judge Weinstein considered a 2008 shooting by Hamas gunmen in Gaza targeting an Israeli government-led delegation at an Israeli observation point. 893 F. Supp. 2d at 484–85. The Judge concluded that subsection (B) (armed conflict between nations) *might* be applicable, since Hamas held a majority of seats in the Palestinian legislature, and controlled Gaza, which "is at least part of a proto-nation." *Id.* at 510. But he decided that the issue required further elaboration and declined to dismiss on that basis, instead elaborating "some of the questions that would be raised . . . in the context of the Israel-Hamas conflict, treating the conflict potentially as a war between nations," including whether the ATA "exempt[s] from the aegis of the civil remedy provision the actions of a paramilitary group—Hamas—tied to a nation's dominant political party." *Id.* Judge Weinstein also concluded that subsection (C) might apply, but only if defendants could demonstrate by a preponderance of the evidence that "Hamas does not [as a general practice] . . . target civilians to any substantial degree."[11] *Id.* at 517.

Other judges have considered the act of war exemption in other contexts. In *Stutts*, Judge Glasser considered the detonation of Iraqi chemical weapons by the Coalition forces during the Gulf War in 1991, which allegedly exposed plaintiffs to toxic agents. 2006 WL 186 7060, at *1.

---

[11] Judge Weinstein's conclusion rested on the following definition of the term "military" as used in subsection (C), which he arrived at following a very lengthy review of the ATA's text, legislative history, and caselaw: "If the general practice of a group not acting as part of a nation's forces is to take actions that would violate the laws of war to any substantial degree if they were committed by a nation, then it cannot be said, under section 2331(4)(C), to be a 'military' force covered by the act of war exception to civil recovery." *Gill*, 893 F. Supp. 2d at 508-17.

Although the detonation took place after a ceasefire was declared, the judge concluded that the case fit "squarely within the [act of war] exemption." *Id.* at *4.

And, in *Morris v. Khadr*, Judge Cassell considered a 2002 al Qaeda attack on members of the U.S. Army in Afghanistan. 415 F. Supp. 2d at 1326. The Court raised the act of war exclusion *sua sponte*. It raised the possibility that Al Qaeda might be considered a "military force" under subsection (C), because plaintiffs alleged that Al Qaeda was "headquartered in Afghanistan and involved a cluster of *military* ideological camps dedicated to their goal of establishing a universal Islamic State through the use of violence." *Id.* at 1333. But, the court ultimately rejected this view. First, it distinguished between "military forces" (which, it noted, are usually defined as affiliated with a *nation*) and "terrorists," and finding that "al Qaeda fits only in the latter" because "they are not a 'nation.'"[12] *Id.* at 1334. Second, it noted that "the burden should fall on [defendant] to prove that his associates were a military force if he wishes to invoke this ATA exclusion."[13] *Id.*

### B. Analysis: The Rocket Attacks Qualify for the Act of War Exception Under Subsection (C)

Under these principles, and guided in part by these precedents, the Court finds that the rocket attacks at issue in the present matter are properly categorized as "act[s] of war" under subsection 2331(4)(C).

First, the Court must decide whether Israel and Hezbollah were engaged in "armed conflict" during the summer of 2006, and whether the rocket attacks occurred "in the course of" this conflict. *See* § 2331(4). Several features weigh in favor of treating this 34-day conflict as an "armed conflict" under the statute. Unlike the attacks in *Biton*, 412 F. Supp. 2d at 3, *Klieman*,

---

[12] As noted above, the Court believes this argument relies on a misreading of the provision.

[13] As noted above, the Court will not resolve the procedural ambiguity here.

424 F. Supp. 2d at 163, and *Gill*, 893 F. Supp. 2d at 484–85, the rocket attacks that form the subject of plaintiffs' complaint were neither isolated incidents, nor were they linked together merely by a common ideology or a longstanding political goal (e.g., the abolition of the state of Israel).  Rather, like the incident in *Stutts*, which occurred during the Gulf War, 2006 WL 186 7060, at *1, the rocket attacks occurred "in the course of" a military conflict that was temporally limited, discrete, waged between Israel and Lebanon over the course of 34 days during the summer of 2006, and provoked by a discrete event.  This conflict began, apparently, with Hezbollah crossing into Israel from Lebanon to kidnap and kill Israeli troops.  This attack ultimately provoked the Israeli military's ground invasion of Lebanon.   It concluded with a United Nations brokered cease fire.

True, Hezbollah is not a national military force.  However, this feature does not weigh against finding "armed conflict" because, as discussed above, the statute's structure implies that non-national military forces are capable of engaging in "armed conflict."

Weighing all of these features of the conflict together, the Court finds that this period of conflict, which is often referred to as the "Israel-Lebanon War" or the "Second Lebanon War," constitutes "armed conflict" under the ATA.[14]

Second, and more difficult, is the question of whether Hezbollah qualifies as a non-national "military force" under subsection (C).  Hezbollah is a terrorist group which routinely targets civilians.  But, during this conflict, Hezbollah engaged in sustained combat with a national military force, initiating an attack on members of that military force, provoking a full-blown invasion of its base-country (Lebanon) by that military, and, ultimately agreeing to a

---

[14] That the Israeli leadership has referred to this conflict as a "war" on several occasions, *See* Defs.' Mem. 1 n.1, 4–6; Pls.' Opp'n 4–6, and, that the Final Report of an Israeli governmental commission's investigation into the conflict concluded that "Israel initiated a long war, which ended without clear military victory,"  Defs.' Mem. 5 (quoting Winograd Commission), *only further* implies that these attacks were part of an "armed conflict."

U.N.-brokered cease fire with that military.  Hezbollah is surely an ambiguous entity—a non-national paramilitary force, a terrorist group, and a part of the Lebanese government—but, in the context of this case, and this particular conflict, the Court weighs these various factors and concludes that during the Israel-Lebanon war, Hezbollah was acting as a "military force" for purposes of subsection (C) of the ATA.

Treating the Israel-Lebanon war as an "armed conflict" and Hezbollah as a "military force" for purposes of their actions during this conflict does not upset the basic definitional principle the Court extrapolated from the statute above; that subsection (C) may exclude some, but cannot exclude all, acts by non-national groups that otherwise form the basis for a valid claim under the ATA. For instance, nothing in this holding would shake the conclusions reached in *Biton*, 412 F. Supp. 2d at 3, *Klieman*, 424 F. Supp. 2d at 163, or *Gill*, 893 F. Supp. 2d at 484–85.  In those cases, defendants had advanced the theory that the attacks were part of a long struggle between a terrorist group and Israel.  And, like the present case, some leaders on both sides in those cases may have described the struggle as a "war."  But the factors reviewed in the above discussion are sufficient to comfortably distinguish the present matter from those cases, and to preserve the availability of ATA for cases like *Biton*, *Klieman*, and *Gill* going forward.

In sum, the rocket attacks meet the ATA's definition of an "act of war" under § 2331(4)(C), and therefore qualify for the exemption under § 2336.  Plaintiffs' ATA claims are dismissed.

## VI.    PLAINTIFFS' ALIEN TORT STATUTE CLAIMS FAIL

The non-American plaintiffs assert claims against BSI and BSPLC pursuant to the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350.  Compl. ¶¶ 146–53 (Count V).  Defendants move to

dismiss these claims under Federal Rule of Civil Procedure 12(b)(1) & (6). Defs.' Mem. 16–22. The Court grants the motion and dismisses the claims for lack of subject matter jurisdiction.

### A.  Legal Standard

The ATS provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.

In *Kiobel v. Royal Dutch Petroleum Co.*, the Supreme Court held that "the presumption against extraterritoriality applies to claims under the ATS, and that nothing in the statute rebuts that presumption." 133 S. Ct. 1659, 1669 (2013). Thus, an action "seeking relief for violations of the law of nations occurring outside the United States" will ordinarily be barred, as it was in that case. *Id.* at 1669, 1662 (finding barred claims brought by Nigerian nationals against Dutch, British and Nigerian corporations, based on actions occurring in Nigeria). However, the Court appeared to leave room for future cases in which the conduct took place outside the United States, but where "the claims touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application." *Id.*; *see also id.* at 1669 (Kennedy, J., concurring) (noting, with approval, that the Court is careful to leave open a number of significant questions regarding the reach and interpretation of the Alien Tort Statute"); *id.* at 1669–70 (Alito, J., concurring) (noting the majority's "narrow approach," which "obviously leaves much unanswered."). Two judges on this court have noted this opening left in the Court's opinion. *Mohammadi v. Islamic Republic of Iran*, 09-cv-1289, 2013 WL 2370594, *14–15 (D.D.C. May 31, 2013) (Howell, J.) ("[T]he Supreme Court hinted as to what type of conduct occurring entirely abroad might confer jurisdiction under the ATS."); *Mwani v. Bin Laden,* 99-cv-125, 2013 WL 2325166, *3 (D.D.C. May 29, 2013) (Facciola, M.J.) ("One could

read this as the Court suggesting that, in some limited instances, an act occurring outside the United States could so obviously touch and concern the territory of the United States that the presumption against extraterritorial application of the ATS is displaced.").

For instance, in *Mwani*, Magistrate Judge Facciola found that Kenyan victims of an American embassy bombing in Kenya had subject matter jurisdiction under the ATS to pursue claims against the foreign terrorist group responsible. He reasoned that a terrorist attack that "1) was plotted in part within the United States, and 2) was directed at a United States Embassy and its employees" met the Supreme Court's test of "touching and concerning the United States with sufficient force" to overcome the presumption against extraterritoriality. 2013 WL 2325166, *4.

### B. Analysis

In the present action, the non-American plaintiffs have asserted ATS claims against foreign defendants for actions that took place in Israel and Lebanon. Under *Kiobel*, these claims will only survive if the underlying attacks "touch and concern" the United States "with sufficient force to displace the presumption against extraterritorial application." 133 S. Ct. at 1659. Plaintiffs point to no facts that would support such a finding. Unlike *Mwani*, where the attack was planned in the United States and targeted at one of its embassies, here the attacks were allegedly funded by Iran, launched from Lebanon, and targeted Israel. *See* 2013 WL 2325166, *4. True, some of the individuals affected by the attacks are American, but there is no indication that the attack was specifically targeted at Americans, rather than Israelis. Because these extraterritorial attacks do not "touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application [of the ATS]," the claims are barred. *See Kiobel*, 133 S. Ct. at 1659.

## VII.    THE COURT DECLINES TO EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFFS' ISRAELI TORTS CLAIMS

Finally, plaintiffs also raise claims under Israeli law against both BSI and BSPLC. Compl. ¶¶ 154–73 (Counts 6 & 7).  In the preceding discussion, the Court has dismissed all of plaintiffs' federal causes of action against BSI and BSPLC—under the FSIA, the ATA, and the ATS—leaving only FSIA claims against other defendants (Iran and CBI) and claims against BSI and BSPLC under foreign law.  Principles of comity indicate that these claims under Israeli law are best addressed by Israeli courts.  Moreover, Section 1367 of Title 28 of the U.S. Code provides that "district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  Plaintiffs concede that "if the Court were to find it had no original jurisdiction, dismissal of the[se] non-federal claims at this early stage of the litigation would be justified." Pls.' Opp'n 10.  Because the Court has dismissed all federal claims against BSI and BSPLC, the Court will decline to exercise supplemental jurisdiction over these remaining Israeli law claims against these defendants.

## VIII.   SERVICE ON REMAINING DEFENDANTS

The only remaining claims in this action are under the FSIA against Iran and CBI. Although the Complaint was filed more than three years ago, plaintiffs still have not served process on eiether these two (now sole-remaining) defendants.  One month ago, after the case was transferred to the undersigned Judge, plaintiffs attempted, for the second time, to accomplish this service on these two defendants via mail service pursuant to 28 U.S.C. § 1608(a)(3).  *See* Certificate of Clerk, June 24, 2013, ECF No. 40; *see also* Docket Entries, July 8, 2010, ECF Nos. 12 & 13 (showing that the prior attempts at mail service on Iran and CBI were unsuccessful).

The FSIA provides that "if service cannot be made within 30 days [via mail service] under paragraph (3)" then plaintiffs in FSIA actions may accomplish service via "diplomatic channels." 28 U.S.C. § 1608(a)(4). Because this action has been pending for an extremely long time with no action, and because several years have elapsed since the Clerk began to attempt mail service, *see* Docket Entries, July 8, 2010, ECF Nos. 12 & 13, the Court will now order plaintiffs to commence service on the remaining defendants via diplomatic channels pursuant to § 1608(a)(4) within 21 days of this opinion.

## IX.  CONCLUSION

All claims against BSI and BSPLC and associated John Does are dismissed and plaintiffs shall commence service via diplomatic channels on the remaining defendants within 21 days of this opinion.

An order shall issue with this opinion.

Signed by Royce C. Lamberth, U.S. District Judge, on August 20, 2013.