UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHAIM KAPLAN, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CENTRAL BANK OF THE ISLAMIC REPUBLIC OF IRAN, *et al.*, <br><br> Defendants. | Civil Action No. 10-483 (RCL) |
| CHAIM KAPLAN, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> HEZBOLLAH, *et al.*, <br><br> Defendants. | Civil Action No. 09-646 (RCL) |

## MEMORANDUM OPINION

This is a civil action for damages pursuant to the Foreign Sovereign Immunities Act ("FSIA") 28 U.S.C. § 1602 *et seq.*, against the Democratic People's Republic of Korea ("North Korea") and the Islamic Republic of Iran.[1]  Plaintiffs are American nationals[2] who were victims

---

[1] The plaintiffs' complaints also name Hezbollah and several banks as defendants, but as the claims against the former were dismissed and plaintiffs have not introduced any evidence as to the liability of the latter, this opinion will proceed solely with respect to North Korea and Iran.

[2] In an action under the Foreign Sovereign Immunities Act ("FSIA") for claims based on personal injury or death resulting from an act of state-sponsored terrorism, either the claimant or the victim must have been at the time of injury an American national, a member of the armed forces, or a U.S. Government employee.  *See* 28 U.S.C. § 1605A(a)(2)(A)(ii). Plaintiffs' counsel has represented that all plaintiffs are nationals of the United States.  The Court's findings are therefore subject to proof of American nationality during the damages phase of these

1

of the Hezbollah[3] terrorist organization's rocket attacks in Israel that occurred during the period of July 12, 2006 through August 14, 2006.

On May 27, 2014, this Court conducted a hearing to determine the liability of the defendants. Having reviewed the extensive evidence presented during that hearing by expert witnesses, the Court has determined that the plaintiffs have established their right to obtain judicial relief against defendants Iran and North Korea. The Court's findings of fact and conclusions of law are set forth below.

## I.  Procedural Background

The plaintiffs in these actions are family members of the rocket attack victims or injured survivors. In April 2009, plaintiffs filed a complaint, and in December an amended complaint, against North Korea pursuant to the FSIA's terrorism exception, 28 U.S.C. § 1605A, and against Hezbollah pursuant to the Antiterrorism Act, 18 U.S.C. § 2333 (1:09-cv-00646-RCL, ECF 1, 5).[4] The following year in March, plaintiffs filed a complaint against the Islamic Republic of Iran and several banks (1:10-cv-00483-RCL, ECF 3). As defendants North Korea and Iran did not answer the complaints, the Court entered defaults as to them in May 2010 (09-646, ECF 18) and May 2014 (10-483, ECF 50), respectively. The plaintiffs moved for entry of judgment on the default as to North Korea, Iran, and the Central Bank of Iran on May 12, 2014 (09-646, ECF 53; 10-483, ECF 51).

---

proceedings. This may be accomplished either through direct testimony of any competent witness, or through the submission of relevant documentation.

[3] *See Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 248 n.1 (D.D.C. 2006) (citing Oxford English Dictionary and noting "the term 'Hezbollah' is synonymous with the terms 'Hizbollah' and 'Hizbullah,' all of which are English transliterations of the Arabic, term referring to the extremist Shiite Muslim group also known as the 'Party of God'").

[4] The Court later dismissed the ATA claim against Hezbollah (ECF 50).

Despite the entries of default, this Court is required to make a further inquiry prior to entering any judgment against the defendants. FSIA mandates that a default judgment against a foreign state may be entered only after a plaintiff "establishes his claim or right to relief by evidence that is satisfactory to the Court." 28 U.S.C. § 1608(e); *see also Flatow v. The Islamic Republic of Iran*, 999 F. Supp. 1, 6 (D.D.C. 1998). As in *Flatow*, the Court will require plaintiffs to establish their right to relief by clear and convincing evidence. The "clear and convincing" standard of proof is the standard required in the District of Columbia to support a claim for punitive damages, and is sufficient to establish a prima facie case in a contested proceeding.

## II. Findings of Fact

As stated above, this Court received testimony from plaintiffs on May 27, 2014, defendants having failed to enter an appearance. The Court now enters its findings of fact, based upon the sworn testimony and documentary evidence presented during the May hearing, and received in accordance with the Federal Rules of Evidence. The Court finds these facts to be established by clear and convincing evidence.

### A. Background

As a matter of policy, North Korea is hostile to the United States, and North Korea has attempted to undermine the political, economic, and strategic power and influence of the United States and its democratic allies. To accomplish this objective, North Korea has previously supported numerous Communist and other anti-Western terrorist organizations. These terrorist organizations are not only opposed to the United States, but they are also opposed to the State of Israel, which they view as allied with the United States. Consequently, North Korea has directly supported terrorist organizations that have carried out attacks in Israel. *See Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441

(D.P.R. 2010) (finding North Korea liable for murdering and injuring Americans in Israel because it supported anti-Israel terrorist organizations). Among the terrorist organizations that North Korea has supported is Hezbollah, which is opposed to the United States and Israel and which is a designated Foreign Terrorist Organization. *See* 62 Fed. Reg. 52650 (Oct. 8, 1997).

### B.  Plaintiffs' Injuries

This Court's findings in combination with the declarations (09-646, ECF 47) presented by plaintiffs alleging that all plaintiffs were killed or injured (directly or indirectly) by the attack, is sufficient to establish defendant's liability in this case under 28 U.S.C. § 1605A. While the evidence presented may not be adequate to demonstrate that *each individual* plaintiff is entitled to damages, plaintiffs have only moved for default judgment *as to liability* not damages, and so the Court need not address these questions at this stage.

### C.  North Korea's Responsibility for the July-August 2006 Rocket Attacks

The Court finds by clear and convincing evidence that Hezbollah carried out the rocket attacks that caused plaintiffs' injuries and that North Korea provided material support. Prior to July 12, 2006, North Korea provided Hezbollah with a wide variety of material support and resources, within the meaning of 28 U.S.C. § 1605A. This material support included professional military and intelligence training and assistance in building a massive network of underground military installations, tunnels, bunkers, depots and storage facilities in southern Lebanon. Moreover, North Korea worked in concert with Iran and the Syria to provide rocket and missile components to Hezbollah. North Korea sent these rocket and missile components to Iran where they were assembled and shipped to Hezbollah in Lebanon via Syria. These rocket and missile components were intended by North Korea and Hezbollah to be used and

were in fact used by Hezbollah to carry out rocket and missile attacks against Israeli civilian targets. Between July 12, 2006 and August 14, 2006, Hezbollah fired thousands of rockets and missiles at civilians in northern Israel. As a result of North Korea's provision of material support and resources, Hezbollah was able to implement and further goals shared by Hezbollah and North Korea.

As to the attacks being carried out by Hezbollah, plaintiffs' expert Professor Guy Podoler stated at the hearing that we know it was Hezbollah by simple process of elimination:

> Q. Can you tell us what knowledge or what basis you have, if any, to connect the rocket attacks to Hezbollah?
>
> A. Well, I would say probably the most important point in this regard would be that I can't see any other political or military faction or group stationed in Southern Lebanon that could have launched such a prolonged attack with thousands of missiles and also conduct ground battles with Israeli soldiers for a long time. We know it wasn't the Lebanese Army. And there are a few smaller factions in Southern Lebanon, but to my knowledge and based on my familiarity with -- it's not my field of expertise, of course, Southern Lebanon -- but as far as I know, I can't point to any other group, militant or other, that could have launched such a prolonged and heavy attack.

Professor Bruce Bechtol pointed out that aside from it being common knowledge that Hezbollah made the attacks, Hezbollah even admits of it:

> Q. I think you were in the courtroom earlier when the Judge asked a question about how do we know that the rocket attacks carried out on

5

> Israel, which are at issue in this case, were carried out by Hezbollah? Are you able to address that?
>
> A. Absolutely. If you would give me a half hour to do an internet search, I can probably bring you about 50 different newspaper articles that not only give the attribution to Hezbollah but where Hezbollah says, yes, we did it. They went on TV and said they did it. We saw them do it. We don't need just that; all we need to do is ask them because they told the world that they were responsible for attacking -- which to me is quite shameful -- for attacking Israeli civilians and military facilities in 2006. They were quite proud of the fact that they were able to survive better than we thought they would against the Israeli defense forces.

With respect to North Korea, the Court finds that it provided material aid to Hezbollah in three ways: weapons, training, and tunnels to help carry out the attacks. Plaintiffs' experts all agree that one of North Korea's primary motivations for aiding Hezbollah is money. In his declaration, Professor Barry Rubin noted,

> North Korea maintains a strategic alliance with Iran. Iran's allies, including Hezbollah, benefit from this alliance. This alliance developed during the Iran-Iraq War (1980-1988). North Korea is an isolated, tyrannical state, in need of hard currency. Mercenary and criminal activities and the selling of weaponry constitute significant sources of income for the regime of Kim Jong-Il. In earlier periods, North Korean support for terrorist organizations had an ideological element, based on shared communist loyalties. Pyongyang stood out from other communist regimes because of its extremist militancy (compared to the USSR and China); its recklessness, systematically taking

>high levels of risk; and its desire to carve out an independent role for itself in promoting revolution and developing clients in the Middle East.

(ECF 36-11 ¶ 21). Professor Podoler argued that while profit, regime survival, military deterrence, and ideology all motivated North Korea to become involved in the Middle East, the main motive is economic factors:

>In particular, the economic aspect appears to be North Korea's main motive since the 1990s. Proof for this surfaced when it was reported that Israeli officials bad met with the North Koreans in 1992-1993, offering North Korea cash in return for the suspension of its missile exports. The deal was not finalized due to various reasons, yet the main point is that the North Koreans seemed willing to discuss such an option.

(ECF 36-9 ¶ 17). At the hearing, Professor Bechtol provided the historical background to North Korea's financial concerns:

>THE WITNESS: It was quite compelling for the North Koreans, sir. In 1990, before the Soviet Union collapsed -- this was during Glasnost and all that stuff, as you recall -- the Soviets at the time told the North Koreans, from now on, we are not going to subsidize your economy at all. Any tank, truck, plane, oil, electricity for your grid now has to be paid for in hard currency, German Deutsche marks, American dollars, or Japanese yen. And they had been subsidizing them with everything, every piece of military equipment, their electric grid, the oil that they used all came from the Soviet Union. That stopped in 1990, and at that moment is when the North Korean economy started going downhill.
>
>THE COURT: So they turned to this as a way to help their own economy?

7

>THE WITNESS: Yes, sir. Illicit activities is probably the best way to look at it. Probably about 70 percent of those illicit activities is weapons proliferation.

Professor Bechtol in his book, admitted as Plaintiffs' Exhibit 6, also provides the Court with an explanation of North Korea's weapons assistance to Hezbollah:

>One of the key non-state actors that North Korea proliferates arms to is Hezbollah. The North Koreans have also provided training to Hezbollah on several occasions over the years. Hezbollah is interesting, because North Korea provides the group with assistance that neither Iran nor Syria could otherwise easily furnish. Pyongyang deals with Hezbollah through Syria, Iran, and sometimes directly, as the evidence shows. The weapons that the North Koreans have been providing for the longest time (and in the highest volume) are components and improved versions of Katyusha and Grad rockets, which are then fired into Israel….
>
>Iran and North Korea jointly produce the M600 series rockets, which have a 300-kilometer range, and these rockets are supplied to both Syria and Hezbollah. Syria made a major contribution to the Hezbollah cause – thanks to North Korea – by providing the Islamic militant group reverse-engineered Kornet antitank missiles (originally produced by the USSR) that it used against the Israel Defense Forces during the 2006 war.

BRUCE E. BECHTOL, JR., THE LAST DAYS OF KIM JONG-IL: THE NORTH KOREAN THREAT IN A CHANGING ERA 118–19 (2013). And at the hearing, Professor Bechtol proved to the Court's satisfaction how we know the rockets Hezbollah used were from North Korea:

> In addition, they supplied the rockets, the 107-millimeter multiple rocket launchers -- we would call them multiple rocket launchers in the United States – and 122-millimeter rocket launchers. The way that it is very easy to determine that these rocket launchers were specifically sent to either Iran or Syria -- because they were sent to both and then funneled into Hezbollah in Lebanon -- is because if you've ever seen a picture of a multiple rocket launcher, it looks like a bunch of barrels all slung together. The rocket launchers that they shipped to Hezbollah were different. It would be just one rocket, so they could launch that one rocket and run away before the [Israeli Defense Forces] got to them with aircraft or artillery. So these were rocket launchers literally built from the ground up specifically for Hezbollah by the North Koreans.

In addition to weapons, North Korea also has provided significant training to Hezbollah. Hezbollah members began travelling to North Korea for specialist instruction as early as the late 1980s. Hezbollah General-Secretary Hassan Nasrallah himself visited North Korea for training purposes during this time. Among other noted Hezbollah members who underwent training in North Korea was Mustafa Badreddine, who served as the movement's counter-espionage chief in the 2006 war. Ibrahim Akil, head of Hezbollah's security and intelligence service, has also received training in North Korea. Specifically, Professor Bechtol noted at the hearing that "they brought key members, about 100 commandoes, out to North Korea and actually trained them with their special operations forces, both from the reconnaissance bureau and what they call -- they called at the time the light infantry training guidance bureau. They now call that the eight special corp."

North Korean involvement in the training of Hezbollah fighters has increased in the period following the 2006 war. In 2007 Iran negotiated an agreement with Pyongyang for 100 Hezbollah field operatives to travel to North Korea to undergo training with the North Korean special forces, as well as counter espionage and intelligence training. This agreement was announced by Hezbollah leader Hassan Nasrallah during a trip to Iran that he made in April, 2007, accompanied by the Iranian ambassador to Syria, Hasan Akhtari.

North Korea has also provided Hezbollah with critical assistance in building an extensive and sophisticated fortified tunnel network in the area south of the Litani River and bordering Israel. This structure proved to be invaluable to Hezbollah in the course of the 2006 war. The configuration and parameters of the tunnel system closely resemble the layout of similar systems in the demilitarized zone separating North and South Korea. Professor Rubin explained in his declaration:

> The army of North Korea excels in the building of tunnels and underground bunker systems. The army maintains a unit, called Unit 583, which answers to the chief of staff and whose task is to maintain and supervise the 20 infiltration tunnels situated along the border with South Korea. In addition, the North Korean Ministry for Public Security and the intelligence service maintain a Bureau of Engineers whose task is the construction of bunkers for the country's leaders and the building of underground infrastructure for the country's nuclear program.

(ECF 36-11 ¶ 44). Rubin further explained that the tunnel and bunker system built for Hezbollah by North Korea "enabled Hezbollah to locate many of its 1000-1500 rocket launchers underground when not in use, thus preventing Israeli aerial surveillance from locating

them." *Id.* at ¶ 46. These rocket launchers were used to fire on the civilian population of northern Israel.

At the hearing, Professor Podoler echoed the importance of the tunnels to Hezbollah in the 2006 war:

> Q. Professor, to your knowledge, to what use has Hezbollah put the tunnels? How do the tunnels help Hezbollah?
>
> A. First of all, to hide, to hide from Israel's retaliation. They were protected there. Again, when the ground fighting took place, then Israeli soldiers encountered and fought the Hezbollah within these tunnels. So they were to hide the troops from being hit by Israeli retaliations and to counterattack from these facilities.
>
> Q. Is there a connection between the tunnels and the Hezbollah missiles or rockets?
>
> A. Yeah. Probably many of the missiles were hidden there, just like North Korea does in its own territory, in its own country, hiding the missiles, hiding technology. So most likely, those missiles, again, you hide them. Then, after launching them, you can again hide the launcher and hide the missile and avoid being hit back.

And as for attributing those tunnels to North Korean aid, North Korea itself admitted to building like tunnels. In an August 2011 press release, admitted as Plaintiffs' Exhibit 7, the Korean Central News Agency stated, "[T]he President ordered commanding officers of the Korean People's Army (KPA) to make tunnel-type defense positions in mountains….When the

11

enemy bombed and shelled the defense positions, KPA soldiers took a rest in tunnels, enjoying songs and dances."

### D. Iran's Responsibility for the July-August 2006 Rocket Attacks

Though the focus of this opinion is on North Korea because this Court has never before addressed the country's connection with Hezbollah, Iran, too, provided material support to Hezbollah for the rocket attacks. This Court has previously held that Iran supports Hezbollah. *See, e.g.*, *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006); *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46 (D.D.C. 2003). The same relationship was present in 2006, concluded Professor Bechtol at the hearing:

> Q. Just to capsulize it, would it be fair to describe the relationship between Iran and Hezbollah as: Hezbollah is a project of Iran?
>
> A. I don't think there is any other way to describe it.

With respect to the rocket attacks, the Court finds that Iran assisted Hezbollah in the same respects North Korea did, most generally by providing the funds for the assistance. Professor Bechtol stated at the hearing,

> And it is also key tying Iran in here. This whole thing was financed by Iran. If you would like to know how specifically that worked, the financing part of it came from what's called office number 39, which is within the party in North Korea. Office number 39 works directly with the Iranian Republican Guard Corps, and then the funds and weapons are actually funneled out through them.

Weapons were funneled through Iran to Hezbollah. And Professor Rubin pointed out that Iran and North Korea were together engaged in the production of the M-600 rockets that

12

give Hezbollah the ability to strike at urban centers in central Israel. (ECF 36-11 ¶ 12). Iran also acted as middleman and facilitator of Hezbollah's training in North Korea. As an illustrative anecdote, the Revolutionary Guards in 2007 negotiated an agreement with North Korea for 100 Hezbollah field operatives to travel to North Korea to undergo training with the North Korean special forces, as well as counter espionage and intelligence training. This agreement was announced to Hezbollah leader Hassan Nasrallah during a trip to Iran that he made in April, 2007, accompanied by Iranian ambassador to Syria Hasan Akhtari. Finally, as pointed out by Professor Bechtol at the hearing, Iran also aided in the tunnel-building process by smuggling North Koreans into Lebanon as their Asian houseboys.

### III. Conclusions of Law

This Court has subject-matter jurisdiction over this case pursuant to the FSIA, which is the sole basis for obtaining jurisdiction over a foreign state. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Although a foreign state is generally immune from jurisdiction in U.S. courts, the FSIA establishes certain exceptions. *Brewer*, 664 F. Supp. 2d at 50. When the requirements of one of these exceptions are met and the foreign state is properly served, the FSIA provides both subject-matter jurisdiction over the action and personal jurisdiction over the foreign state. *Id.* Here, plaintiffs' have satisfied the requirements of the FSIA's terrorism exception and have properly served North Korea and Iran.

#### A. Personal Jurisdiction

"A foreign state … must be served in accordance with 28 U.S.C. § 1608." Fed. R. Civ. P. 4(j)(1). Section 1608 provides several methods to serve a foreign state, but only § 1608(a)(3) is relevant because there is no "special arrangement for service" in this terrorism case nor are North Korea and Iran parties to "an applicable international convention on service of judicial documents." *See* § 1608(a); *see generally Brewer*, 664 F. Supp. 2d at 50-51

13

(discussing service of process under § 1608 in a terrorism case). As discussed above, plaintiffs have complied with the requirements of § 1608(a)(3) because they sent North Korea and Iran copies of the summons, complaint, and notice of suit, along with an appropriate translation of each, and dispatched these documents by the clerk of the court. The diplomatic notes provide appropriate proof of service as to each foreign state. Accordingly, this court has personal jurisdiction over North Korea and Iran if plaintiffs are able to establish that they are covered by an immunity exception within the FSIA. *See Brewer*, 664 F. Supp. 2d at 51.

### B. Subject-Matter Jurisdiction and Liability

In 2008 Congress enacted a comprehensive terrorism exception to the FSIA that was meant to waive sovereign immunity and provide terrorism victims with a cause of action in cases involving certain types of state sponsored terrorism. *See Brewer*, 664 F. Supp. 2d at 51. This terrorism exception is now codified as 28 U.S.C. § 1605A, and it has previously been applied to North Korea because it supported terrorist attacks against Israel that harmed American nationals. *See Calderon-Cardona v. Dem. People's Rep. of Korea*, 723 F. Supp. 2d 441, 457 (D.P.R. 2010).

Section 1605A provides, in relevant part, that a foreign state shall be liable for providing material support or resources to a terrorist attack that injures or kills an American national provided that money damages are sought and that (1) the foreign state "was designated as a state sponsor of terrorism at the time of the act," and (2) "either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section." § 1605A(a)(2)(A)(I).

In this case, plaintiffs' claims against North Korea meet these requirements for purposes of subject-matter jurisdiction and liability. *See Kilburn v. Islamic Republic of Iran*, 699 F. Supp.

14

2d 136, 155 (D.D.C. 2010) (noting "the elements of immunity and liability under § 1605A(c) are essentially the same in that § 1605A(a)(1) must be fulfilled to demonstrate that a plaintiff has a cause of action"). *See also Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53 (D.D.C. 2008) (same).[5]

First, North Korea "was designated as a state sponsor of terrorism at the time of the act" that caused plaintiffs' harm. Section 1605A(h)(6) defines a "state sponsor of terrorism" as "a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 App. U.S.C. 2405 (j)) … is a government that has repeatedly provided support for acts of international terrorism." And North Korea was so designated in 1988. *See Notice, Determination Pursuant to Section 6(j) of the Export Administration Act of 1979; North Korea*, 53 Fed. Reg. 3477 (Feb. 5, 1988), 1988 WL 276528. More importantly, North Korea remained a designated state sponsor of terrorism during the 2006 Hezbollah rocket attacks that harmed the plaintiffs, and it was not until October 11, 2008 that Secretary of State Condoleezza Rice removed North Korea from the U.S. State Sponsor of Terrorism list. *See Notice, Rescission of Determination Regarding North Korea*, 73 Fed. Reg. 63540 (Oct. 24, 2008).[6] Additionally, because plaintiffs

---

[5] The fact that liability arises once sponsorship of terrorist activities is demonstrated for jurisdictional purposes is unsurprising since "[s]ponsorship of terrorist activities inherently involves a conspiracy to commit terrorist attacks. As a co-conspirator, both with its own agents, officials and employees, and with others, such as the terrorist organization and the ultimate perpetrators, the foreign state is also a joint tortfeasor." *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 27 (D.D.C. 1998).

[6] This decision was based on a presidential memorandum, *Certification of Rescission of North Korea's Designation as a State Sponsor of Terrorism*, 73 Fed. Reg. 37351 (Jun. 26, 2008), wherein President Bush certified that: "(i) the Government of North Korea has not provided any support for international terrorism during the preceding 6-month period; and (ii) the Government of North Korea has provided assurances that it will not support acts of international terrorism in the future." This presidential memorandum, however, did not address intelligence information regarding North Korean support for international terrorism prior to December 26, 2007 or, for example, H.R. 3650, the "North Korean Counterterrorism and Nonproliferation Act," a bill introduced into Congress on September 25, 2007, which cited reports that "North Korea was involved in training

15

filed their Compliant on April 8, 2009, North Korea remained a designated state sponsor of terrorism "within the 6-month period before" plaintiffs' claims were filed pursuant to § 1605A. Accordingly, Plaintiffs' complaint was not only timely filed, but it concerned terrorist attacks that occurred when North Korea was a designated state sponsor of terrorism.

Iran has been designated a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979, 50 U.S.C. App. 2405(j), section 620A of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371, and section 40 of the Arms Export Control Act, 22 U.S.C. § 2780, since January 19, 1984. *See* United States Dep't of State, *State Sponsors of Terrorism*, http://www.state.gov/j/ct/list/c14151.htm (July 21, 2014, 5:00 PM).

The other requirements of § 1605A are also met because plaintiffs are American nationals seeking money damages for personal injuries or death that occurred from terrorist attacks that were materially supported by North Korea and Iran. Section 1605A(h)(3) defines "material support or resources" as having the same meaning as in 18 U.S.C. § 2339A, which defines it to include "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (one or more individuals who may be or include oneself), and transportation, except medicine or religious materials." Section 2339A(b) further defines "training" as "instruction or teaching designed to impart a specific skill, as opposed to general knowledge" and "expert advice or assistance" as "advice or assistance derived from scientific, technical or other specialized knowledge."

---

in guerilla warfare of Hezbollah cadres who subsequently were involved in operations against Israeli forces in south Lebanon."

filed their Compliant on April 8, 2009, North Korea remained a designated state sponsor of terrorism "within the 6-month period before" plaintiffs' claims were filed pursuant to § 1605A. Accordingly, Plaintiffs' complaint was not only timely filed, but it concerned terrorist attacks that occurred when North Korea was a designated state sponsor of terrorism.

Iran has been designated a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979, 50 U.S.C. App. 2405(j), section 620A of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371, and section 40 of the Arms Export Control Act, 22 U.S.C. § 2780, since January 19, 1984. *See* United States Dep't of State, *State Sponsors of Terrorism*, http://www.state.gov/j/ct/list/c14151.htm (July 21, 2014, 5:00 PM).

The other requirements of § 1605A are also met because plaintiffs are American nationals seeking money damages for personal injuries or death that occurred from terrorist attacks that were materially supported by North Korea and Iran. Section 1605A(h)(3) defines "material support or resources" as having the same meaning as in 18 U.S.C. § 2339A, which defines it to include "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (one or more individuals who may be or include oneself), and transportation, except medicine or religious materials." Section 2339A(b) further defines "training" as "instruction or teaching designed to impart a specific skill, as opposed to general knowledge" and "expert advice or assistance" as "advice or assistance derived from scientific, technical or other specialized knowledge."

---

in guerilla warfare of Hezbollah cadres who subsequently were involved in operations against Israeli forces in south Lebanon."

Based on the allegations in Plaintiffs' Amended Complaint and the evidence presented by plaintiffs, there can be no doubt that North Korea and Iran provided material support to Hezbollah. In particular, North Korea provided Hezbollah with advanced weapons, expert advice and construction assistance in hiding these weapons in underground bunkers, and training in utilizing these weapons and bunkers to cause terrorist rocket attacks on Israel's civilian population; and Iran financed North Korea's assistance and helped transport weapons to Hezbollah. These terrorist rocket attacks that North Korea and Iran facilitated directly caused plaintiffs' injuries. As such, neither is immune from liability under the FSIA pursuant to § 1605A(a)(1), and they are specifically liable to plaintiffs pursuant to § 1605A(c).

### IV.     Conclusion

This Court possesses subject matter jurisdiction over this action and personal jurisdiction over defendants North Korea and Iran. Plaintiffs have established to this Court's satisfaction, pursuant to 28 U.S.C. § 1608(e), that North Korea and Iran are liable for damages because they provided material support and assistance to the Hezbollah terrorists who fired the rockets at Israel that caused plaintiffs' injuries. Accordingly, plaintiffs' motion for default judgment is hereby GRANTED with respect to North Korea and Iran for purposes of liability, and DENIED with respect to the Central Bank of Iran (CBI), as plaintiffs presented no evidence as to its liability. As the plaintiffs have not presented any evidence upon which the Court may find CBI liable, the Court hereby dismisses the case against CBI. Plaintiffs shall hereafter submit additional evidence regarding the issue of damages against North Korea and Iran.

Upon consideration of the need for judicial economy, the question of individual damages shall be referred to a Special Master to take evidence and file a report and recommendation. Rule 53 of the Federal Rules of Civil Procedure provides that any party may suggest candidates for

17

appointment. In a number of prior cases involving Iran, the Court has appointed Alan Balaran as Special Master. Any other suggested candidates shall be submitted to the Court within 15 days of this date.

**SO ORDERED**

Signed by Royce C. Lamberth, U.S. District Judge, on July 23, 2014.